343 So.2d 477 (1977)
HIGHWAY DEVELOPMENT COMPANY, INC., et al.
v.
MISSISSIPPI STATE HIGHWAY Commission.
No. 49197.
Supreme Court of Mississippi.
March 9, 1977.
*478 Butler, Snow, O'Mara, Stevens & Cannada, C. Eugene McRoberts, Jr., James L. Martin, Jackson, for appellants.
Virgil G. Gillespie, Gulfport, for appellee.
Before PATTERSON, ROBERTSON and BROOM, JJ.
BROOM, Justice, for the Court:
By eminent domain in a Special (County) Court of Harrison County, Mississippi State Highway Commission (hereinafter commission) condemned 2.95 acres of land out of 8.56 acres owned by Highway Development Company, Inc. (hereinafter HDC). HDC appealed to Circuit Court (First Judicial District) which affirmed the Special Court judgment awarding HDC $35,000 for its 2.95 acres. The case is here on HDC's direct appeal, and the Commission's cross appeal. We affirm.
FACTS: After HDC's president (May) learned from news media and discussions with commission officials that the proposed interstate system (I-10/Lorraine Road interchange) would involve the subject land, HDC purchased the 8.56 acres. The land consisted of two parcels: the northwest (CD-1) and northeast (CD-2) quadrants of the intersection of I-10 and Lorraine Road. CD-1 and CD-2 are on opposite sides of Lorraine Road which runs north and south intersecting I-10 which runs east and west. Both CD-1 and CD-2 are situated immediately north of I-10. HDC optioned and then sold to Continental Oil Company for $80,000 .75 acres (Part of CD-2) for a first-off service station site in the northeast quadrant of the intersection as then planned. HDC similarly optioned to Gulf Oil Corporation part of CD-1 in the northwest quadrant of the planned intersection. Gulf declined to exercise the option because the commission revised the project plans thereby requiring acquisition of greater acreage for rights-of-way so as to embrace parts of CD-2 (the northeast quadrant, part of which HDC sold to Continental) and CD-1 (including that optioned to Gulf in the northwest quadrant). Realizing the land (including parts of CD-1 and CD-2) would be condemned, May set out to acquire and did acquire for HDC additional lands designated CD-3 on the east side and CD-4 on the west side of Lorraine Road situated directly north of CD-1 and CD-2 so as to have first and second-off service station sites as per the revised plans. HDC says the commission paid Continental approximately $80,000 (a negotiated settlement) for the site HDC sold Continental.[1] After acquiring the parcel from Continental by negotiation, the commission condemned the subject 2.95 acres (Parcels CD-1 and CD-2 less the part bought from Continental). HDC contends it should be compensated by the commission in terms of the value or square footage price ($2.45 per square foot) Continental paid HDC for .75 acres in CD-2. The commission contends HDC is entitled to compensation based upon the before and after rule applied as of the filing date (April 2, 1970) of the eminent domain suit.
*479 First trial (county court) in August 1970 resulted in a $30,000 verdict, but the trial court sustained HDC's motion for a new trial. Retrial in August 1971 resulted in a $35,000 verdict whereupon HDC appealed to circuit court and the commission cross appealed. Affirmance was ordered by the circuit court as to all issues.
The threshold issue is: Did the change in the right-of-way plans of the highway commission constitute a second or supplemental taking?
HDC argues that the trial court erred in refusing to instruct the jury peremptorily that as a matter of law the eminent domain taking constituted a second or supplemental taking. HDC requested and was granted instructions (without objection) allowing the jury to decide if the condemnation constituted a second taking, which issue the jury resolved against HDC. HDC's position is that it acquired subject land (CD-1 and CD-2) after assurances were given its president, May, by commission officials that the project plans were final (Steinwinder denied this). HDC alleges it caused to be deeded to the commission a .14 acre strip (by Bensons, third parties, who had optioned the strip to HDC) in return for the commission issuing HDC a permit for curb cuts at the Continental site. HDC also alleges it quitclaimed the strip to the commission but the record is not clear in this regard. The alleged deeding of this .14 acre strip, according to HDC, was an original taking and therefore any taking necessitated by the change and enlargement of the preliminary plans constituted a second or supplemental taking.[2]
Pearl River Valley Water Supply Dist. v. Wood, 252 Miss. 580, 172 So.2d 196 (1965), held that publication of preliminary plans was not a taking of land, and that "institution of the suit" is the date to which before and after values relate. See also, Jackson Municipal Airport Authority v. Wright, 232 So.2d 709 (Miss. 1970). In the present case neither the newspaper publication of plans seen by May, nor plans viewed by him in the commission office, nor stakes placed in the field, nor the alleged conveyance by the Bensons (at HDC's instance) of the .14 acre strip to the Mississippi State Highway Commission in exchange for HDC's curb-cut permit, is binding upon the condemnor as a taking. Institution of the condemnation suit on April 2, 1970, is the date of the taking, and is the date as to which the land derives its before and after value (as used by the commission in its land appraisals). HDC accurately states that during the trial witness Steinwinder, Roadway Design Engineer for the Commission, testified that enlargement of the plans amounted to a second taking. Nevertheless, Steinwinder's utterances in this regard were no more than his thoughts about the matter because the determination of what constitutes a second or supplemental taking is a question of law for the court (not a project engineer) to resolve.
Pearl River Valley Water Dist. v. Brown, 254 Miss. 685, 182 So.2d 384, 184 So.2d 407 (1966), recognized the principle of general enhancement in value that normally flows when a new public project is announced with reference to a locality. General enhancement in value is not what HDC seeks here. It seeks specific enhancement in value to a small parcel of land which it holds for alleged first-off and second-off service station locations at CD-1 and CD-2 when in fact first-off and second-off locations were still owned by Watkins Land Company, Inc. at CD-3 and CD-4. Watkins is owned by the wives of May and Mounger (HDC owners). HDC, in purchasing the condemned land, assumed the risk that the construction plans might be changed as to this Federal-State Highway Project. The record before us does not establish a second taking and, therefore, the trial judge did not err in his refusal to peremptorily instruct the jury to that effect.
Next, HDC argues that the trial court erred in allowing the commission to show: *480 HDC's transfer of parcels CD-3 and CD-4 to Watkins Land Company, Inc. (hereinafter Watkins); the relationship between the stockholders of the corporations, HDC and Watkins; and to develop testimony that when May (HDC's president) learned of the change in plans of the highway interchange project, HDC purchased additional land (CD-3 and CD-4) to the north of the land involved in this eminent domain suit. This testimony was also to the effect that CD-3 and CD-4 were then deeded, at the suggestion of the Chief of the Commission's Right-of-Way Department, to Watkins, the corporation (owned by the wives of HDC's owners, May and Mounger) which May caused to be organized. While May refused to admit that the commission's right-of-way chief specifically told him to form a corporation and transfer to it parcels CD-3 and CD-4, scrutiny of the record reveals May's testimony that the official told him, "we could more properly assess your damages if these properties were in separate ownership." Obviously, Watkins was created to constitute an entity to which HDC could convey the last acquired land (CD-3 and CD-4).
Apparent is the fact that had HDC continued to own the land transferred to Watkins (CD-3 and CD-4), HDC's posture would not have been such as to permit its advancement of the theory of supplemental or second taking. On each of CD-1, CD-2, CD-3 and CD-4 there was a first-off and second-off access location suitable for a service station. Thus without the transfer to Watkins, HDC would have been in the untenable position of alleging ownership (and compensation for) eight service station locations rather than four. Nevertheless, HDC contends that it was entitled to any enhancement or appreciation in value of subject property as evidenced by the purchase of .75 acres by Continental from HDC for $80,000. HDC says this is especially so because the commission paid Continental approximately $80,000 (as shown above, this is not clearly established by the record), the same amount paid HDC by Continental. HDC objected to introduction of the testimony about the transfer to Watkins, pointing out: lack of relevancy, Watkins was not a party defendant, and just compensation for HDC's property (CD-1 and CD-2) was the singular issue. The commission argues that it was necessary to pierce the corporate veil in order to serve the ends of justice because the corporation (Watkins) was formed for the purpose of inflating property valuations and was no more than a fiction-like vehicle to that end.
The trial court held that the testimony was competent. Excerpted from the record is the following:
BY THE COURT: The court was of the opinion in the last trial that this type of testimony was competent, the court felt that the jury had the right to take into consideration any and all testimony that came from the Highway Commission officials and Mr. May and to make the second or supplemental taking in this case the theory of it it has been necessary that the testimony be given as to what highway authorities and commissions (sic) advised Mr. May... .
Then in the presence of the jury, over HDC's objection, the facts and circumstances of the relationship between Watkins and HDC were developed.
While holding to the principle that piercing the veil of a corporation is not to be undertaken lightly, we will not rigidly maintain the distinct corporate identity where, as would be the case here, to do so would subvert the ends of justice. Johnson & Higgins of Mississippi, Inc. v. Commissioner of Insurance, 321 So.2d 281 (Miss. 1975); 1 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 43 at 209 (Perm.Ed. 1974). In ruling upon HDC's objection, the trial judge indicated it was his opinion that the testimony offered went directly to the issue raised by the defendant landowner as to second or supplemental taking. After hearing all of the testimony, the jury was instructed at HDC's request not to diminish the award of compensation "because of any dealings or transactions between" HDC and Watkins, "or because of the fact that the stockholders of Watkins ... are the wives of ... May *481 and ... Mounger." We hold upon the particular facts and circumstances of this case that the judge did not commit reversible error in ruling that the probative worth of the testimony (as to Watkins) justified its admission. Rayner v. Lindsey, 243 Miss. 824, 138 So.2d 902 (1962), 31A C.J.S. Evidence § 159 (1964).
Argument of the Commission on cross appeal is that the $30,000 jury verdict of the first trial should be reinstated. The commission also argues that the trial court erred in admitting certain testimony by HDC's witnesses of comparable sales, but neither of these contentions warrants reversal. Our rule is that whether a comparable sale is sufficiently similar to circumstances existing in a pending case rests largely within the discretion of the trial court. It has not been shown here on the particular facts of this unique case that there was any abuse of discretion on the part of the trial judge in admitting evidence of comparable sales.
We note that the verdict and judgment which we now affirm (after two jury trials) awards HDC an amount based upon the testimony of appraisers who gave consideration to the general enhancement (accruing after announcement of the project) in value of the condemned property. The award returns to HDC a sum much greater than the average amount per acre it paid for the land after the project had been announced. What HDC actually sought from the jury were the profits it would have made had it been allowed to further speculate in alleged service station sites on the condemned property. To uphold HDC's contentions would result in the commission paying speculative land values for so-called service station sites which in reality are not such sites as per the revised plans. Prior to trial, HDC had acquired similar service station sites (CD-3 and CD-4) just north of the property condemned. The fact that CD-3 and CD-4 were conveyed by HDC to another corporation (Watkins) owned entirely by wives of HDC's owners, will not justify reversal or awarding HDC compensation comparable to the speculative price HDC received from Continental based on the theory of a second or supplemental taking.
AFFIRMED ON DIRECT AND CROSS APPEALS.
PATTERSON and INZER, P. JJ., and SMITH, ROBERTSON, SUGG, WALKER and LEE, JJ., concur.
GILLESPIE, C.J., took no part.
NOTES
[1] The record is ambiguous as to whether in fact $80,000 was paid Continental by the commission. At trial the commission objected to testimony concerning Continental's sale to the commission. The trial judge overruled and stated: "He is not attempting to give value."
[2] Whether the commission ever recorded or accepted a conveyance of the .14 acre strip is not discernible from the record.