# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CA-00678-SCT

*NASH PLUMBING, INC. AND MILTON NASH*

*v.*

*SHASCO WHOLESALE SUPPLY, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 5/7/2001 |
| TRIAL JUDGE: | HON. HENRY L. LACKEY |
| COURT FROM WHICH APPEALED: | CHICKASAW COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | ROGER M. TUBBS |
| ATTORNEY FOR APPELLEE: | REX F. SANDERSON |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 06/24/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1. In November, 1999, Shasco Wholesale Supply, Inc. (Shasco) brought suit in the Chickasaw County Circuit Court, First District, against defendants Milton Nash (Nash), Tommy Turner (Turner), Nash Plumbing, Inc. (Nash Plumbing), and A.C.T. Services, Inc. (A.C.T.). to recover a debt of $5,630 owed for plumbing supplies sold by Shasco, invoiced to A.C.T., received by Nash or Nash Plumbing,[1] but never paid for. Milton Nash was president of Nash Plumbing, and Tommy Turner was president of A.C.T.

---

[1] In his written judgment, the circuit court judge found that the goods were delivered to Milton Nash or to a corporation owned or controlled by Milton Nash.

¶2.     A bench trial was held on March 20, 2001.  A.C.T. was not represented at trial, although Tommy Turner testified.  Milton Nash and Nash Plumbing were represented, but neither put on a defense, nor did Milton Nash appear during trial to testify.  A judgment in the amount of $10,808.45, which included the $7,010.15 reflected on Shasco's accounting and $3,798.30 in attorney's fees, out-of-pocket expenses and interest, was entered by the circuit court on May 7, 2001, against Milton Nash, Nash Plumbing, Inc., Roto-Rooter of North Mississippi, Inc., and Nash Services Group, Inc[2].  No judgment was entered by the circuit court against A.C.T. or its president, Tommy Turner.

¶3.     Although the circuit court judgment did not include an explanation of the legal theories upon which it based its judgment, the judge stated that he was of the opinion that Nash had "used the corporate shield to manipulate."   However, due to the contradictions between Turner's testimony and the documentary evidence he supplied concerning the relationships between the parties, particularly the corporate entities, we are unable to affirm the trial court on this basis.  Therefore, we hold that Milton Nash, individually, and Nash Services Group (f/k/a Roto-Rooter of North Mississippi) cannot be held liable, but that based on equitable estoppel principles, A.C.T. Services is held jointly and severally liable along with Nash Plumbing, for the judgment in favor of Shasco.  We affirm the trial court in all other respects.

**FACTS**

¶4.     These facts are taken from the record and from the uncontested trial testimony of Tommy Turner, president of A.C.T. Services, Inc. and Kenny Scott, president of Shasco, Inc. Milton Nash was the

---

[2]     Neither Roto-Rooter of North Mississippi nor Nash Services Group, Inc. were named in the law suit.  Roto-Rooter of North Mississippi changed its name to Nash Services Group, Inc. in May, 1998, per a March 31, 1998, amendment to its articles of incorporation.  Tommy Turner is shown in the State's records as president and Milton Nash as vice president of Nash Services Group, Inc.

president of at least two corporations, Nash Plumbing, Inc., and Roto-Rooter of North Mississippi, Inc. According to Turner, these two companies did similar work, but Nash Plumbing performed the larger, American Institute of Architects (AIA), construction jobs, and Roto-Rooter performed the smaller residential air conditioning and non-contract jobs. Together, these companies were sometimes referred to as the Nash Group or simply "Nash." Turner testified that around September, 1997, Milton Nash approached him with an offer to purchase A.C.T. Turner testified that this as a good fit because Nash had no sheet metal or air conditioning capability, so subcontracted out this portion of its construction jobs, and A.C.T. had a nice sheet metal shop and performed this type of work. Turner further testified that Nash Plumbing was also in need of a mechanical license, which Turner could supply; and Nash Plumbing was in a better position to provide the performance bonds for the jobs. In anticipation of a buy-out agreement, A.C.T. Services, Inc. and Nash Plumbing, Inc. executed a "Management Agreement" [3] in which Milton Nash was to manage A.C.T. until Turner and Nash could "hammer out" a deal for Nash to acquire A.C.T. Turner also testified that he (Turner) had been an absentee owner and was not familiar with the daily operations of A.C.T. The record corroborates that Turner knew very little about the corporate transactions with which he was involved.

¶5.     According to Turner's testimony, A.C.T. ceased operation as of December 31, 1997[4], and "Nash"

---

[3] Turner testified that Milton Nash "wrote up" the Management Agreement, which in Paragraph 9 stated: "The parties to this Agreement acknowledge that this Management Agreement is executed in anticipation of the execution of a more detailed acquisition and merger agreement between the parties, the objective of which is to increase the market share of [Nash Plumbing, Inc.] and [ACT Services, Inc.]. The provisions of this Management Agreement shall be interpreted in light of this objective."

[4] Turner testified that the last tax return filed for A.C.T. was at the time of the acquisition agreement in March, 1998.

took over all of A.C.T.'s assets and liabilities as of that date. Turner stated that it took until March 12, 1998, to work out the agreement for "Nash" to acquire A.C.T.[5] and during this time, A.C.T. was in a transition period, with employees working one day for A.C.T. and the next day for Nash Plumbing. The same day that the acquisition agreement was executed, a Consulting Agreement was also executed between Tommy Turner and the two Nash companies, Nash Plumbing and Roto-rooter of North Mississippi, in which Turner was to be a paid consultant for the Nash companies.

¶6.     Turner further testified that A.C.T. had bid and won several commercial air conditioning jobs, which Nash Plumbing began managing; that Nash hired supervisors for each job; and with the exception of one job, Nash Plumbing entirely controlled the jobs. Turner also testified that Milton Nash was managing and controlling A.C.T. as well as Nash Plumbing and Roto-Rooter (Nash Services Group) and using the assets and employees of all companies to complete the construction jobs in the names of both Nash Plumbing and A.C.T.

¶7.     When the trial judge questioned Turner about who received payment for the jobs, Turner stated that Nash received the payments and was in control of all money paid toward the A.C.T. contracts. When asked how the jobs were handled, Turner testified about one job, the ICC Building in Fulton, which was an A.C.T. contract, stating "[i]t was 100 percent totally handled by Nash. We never got any checks, never did any work. I'm sure a lot of these materials went on that job." Nash did not testify in his own defense,

_____

[5] For reasons not explained, the document that Turner offered in support of his testimony that "Nash" took over A.C.T. made no reference to A.C.T. or to Nash Plumbing or Roto-Rooter of North Mississippi, but instead was an agreement between Turner and a "Mississippi corporation" named A.C.T./Roto-Rooter. There is no evidence that A.C.T./Roto-Rooter has ever existed as a Mississippi corporation.

nor in defense of Nash Plumbing, and no evidence was presented to dispute this claim.

¶8.     Shasco president Kenny Scott testified that Shasco opened the A.C.T. account in the latter part of 1997.He stated that invoices sent to A.C.T. in December, 1997 and January, 1998, were paid by A.C.T. Invoices dated February through April 1998 were left unpaid. Scott testified that his employee went to A.C.T. to find out why the invoices were not being paid, was told that Nash Plumbing was buying out A.C.T., and was directed to Nash Plumbing for collection of the debt[6]. Scott then personally visited Milton Nash in early July, 1998, at the Nash Plumbing office after calling several times with no response. The trial record supports Scott's contentions that Milton Nash admitted to him during this meeting that the debt belonged to Nash Plumbing and that Nash not only promised to pay for any material or supplies ordered by A.C.T. but also gave Scott a check drawn on the Nash Plumbing account in the amount of $3,653.19 for seven invoices with dates in February and March of 1998. The invoices were for sheet metal material and supplies ordered on the A.C.T. account. According to Scott, Nash then told Scott he would "have some more money in a couple of weeks."

¶9.     The trial testimony supports the circuit court's finding that Shasco supplied sheet metal and other materials to A.C.T.; the materials were being used on jobs managed and controlled by Nash Plumbing; Nash Plumbing was being paid directly for the jobs; and no money was going back into A.C.T., or to Shasco to pay for the supplies.

## ANALYSIS

¶10.    A circuit court judge sitting without a jury is accorded deference with regard to his findings on

---

[6] Nash Plumbing applied for credit with Shasco on April 28, 1998, but was rejected by Shasco due to poor credit references.

appeal as long as his findings are supported by substantial, credible, and reasonable evidence. ***Puckett v. Stuckey***, 633 So.2d 978, 982 (Miss. 1993). However, we review the circuit court's legal conclusions de novo. ***Bank of Miss. v. S. Mem'l Park, Inc.***, 677 So.2d 186, 191 (Miss. 1996).

### 1. Liability of Nash Plumbing for the Shasco debt.

¶11. Nash argues that the trial court erred in awarding a judgment against Nash Plumbing for payment of the Shasco debt because the debt was listed in the name of A.C.T., and because Nash Plumbing's credit application had been rejected by Shasco. Nash further argues that if any entity actually took over A.C.T., it was Nash Services Group, and that Shasco sued the wrong company. Nash supplied no documentation to show which entity took over A.C.T., and the documentation supplied by Turner showed it was a company by the name of A.C.T./Roto-Rooter. Regardless of which entity legally assumed the assets and liabilities of A.C.T., Nash Plumbing is the one company that benefitted from A.C.T.'s assets, including the products purchased from Shasco. It used these assets on its larger "Nash Plumbing" managed jobs, and was paid for these jobs. There was no testimony or evidence presented that disputes this.

¶12. It also appears that Shasco's efforts to obtain information about which entity took over A.C.T. were subverted. Shasco filed a discovery request for Nash to produce any document that was signed by Milton Nash or Nash Plumbing, with A.C.T. and Tommy Turner, or either of them, during the period of time of January through July, 1998, which was answered by Nash with the word "None." There are two documents in the record signed by both Tommy Turner and Milton Nash, one signed by Milton Nash as president of Nash Plumbing, during the specified period, so this appears to be a blatant misrepresentation made by Nash and Nash Plumbing to Shasco. Based on the representations made by Nash and Turner, including paragraph 9 of the Management Agreement, and from the way that Nash and Turner were

6

conducting business, it would be unreasonable for Shasco to believe that some company other than Nash Plumbing acquired A.C.T., if A.C.T. had been acquired.

¶13. There is sufficient evidence available to support the trial court's ruling that Nash Plumbing was liable for the Shasco debt. Although A.C.T. and Nash were negotiating on some type of acquisition agreement, and Turner testified that A.C.T. ceased doing business on 12/31/97, Shasco was not made aware of this until several months later, after the supplies had been delivered in the name of A.C.T. Shasco rejected Nash Plumbing's request for credit, so arguably would not have supplied Nash Plumbing with the materials on credit. Based on equitable estoppel principles, the circuit court was correct.

¶14. Equitable estoppel requires that there be 1) a belief and reliance on a representation or omission, 2) a change in position as a result of the representation; and 3) detriment or prejudice caused by the change of position. *In re City of Southaven*, 864 So.2d 912, 917 (Miss. 2003). Therefore, based on omissions by A.C.T. and Nash Plumbing, Shasco made a change in position by supplying, on credit, materials to a company which it would not have supplied materials to otherwise. The fact that Shasco has never been paid for these materials and has been forced to bring suit is an obvious detriment to Shasco.

¶15. Additionally, Nash Plumbing used and benefitted from the A.C.T. assets, including the line of credit established with Shasco and the supplies delivered to the companies. Nash admitted to Shasco's president that the debt belonged to Nash Plumbing and made a partial payment for same. Nash Plumbing may not now equitably disclaim the relationship that he represented having with A.C.T. in order to shield himself from liability.

 *2. Liability of Milton Nash, individually, for the Shasco debt.*

¶16. The trial court found Milton Nash personally liable, indicating that Nash was manipulating the

7

corporations for his benefit and to Shasco's detriment. The evidence presented at trial could reasonably lead to the conclusion that: Nash was controlling all the corporate entities involved; he was not forthcoming to anyone about the actual corporate dealings that were going on; he led Turner and others to believe that A.C.T. was being acquired by Nash Plumbing; he secured the benefit from the use of Shasco's products without the intention to pay for them; and subsequently hid behind the dubious corporate agreements that he was instrumental in preparing in order to avoid liability. Nevertheless, Shasco clearly failed to make sufficiently particularized allegations demonstrating the applicability of the veil piercing doctrine to the facts of the case. *See N. Am. Plastics, Inc., v. Inland Shoe Mfg. Co.*, 592 F. Supp. 875, 879 (N.D. Miss. 1984). Shasco failed to plead that the court should pierce the corporate veil of either corporation. Additionally, Shasco provides no case law for the proposition that Milton Nash or Tommy Turner, as individuals should be held liable for the debt of any corporation under any other theory.

¶17. A fundamental principle of corporate law is that shareholders are not liable for the obligations of the corporation. Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study*, 76 Cornell L. Rev. 1036, 1039 (1991). Courts do not take piercing of the corporate veil lightly because of the chilling effect it has on corporate risk-taking. *Highway Dev. Co. v. Miss. State Highway Comm'n*, 343 So.2d 477, 480 (Miss. 1977). The record before us holds too many unknowns and too many contradictions for this Court to uphold the piercing of the Nash Plumbing corporate veil to hold Milton Nash personally liable.

*3. Liability of Roto-Rooter of North Mississippi, now Nash Services Group,*

*for the Shasco debt.*

¶18.　It is clear that because Roto-Rooter of North Mississippi, f/k/a Nash Services Group, was not served with process and was not named in this suit, it cannot be held liable. ***Paepcke-Leicht Lumber Co. v. Savage***, 137 Miss. 11, 101 So. 709, 711 (1924).　　*4. Liability of A.C.T. for the Shasco debt.*

¶19.　Although Turner testified that A.C.T. was acquired by "Nash" and A.C.T. ceased doing business as of 12/31/97, it was not dissolved as a corporate entity until March 9, 2001.  As discussed earlier, the evidence submitted during the trial does not support the claim that there was a merger between A.C.T. and any Nash entity.  Had an actual merger taken place, A.C.T. would have had the obligation to pay its creditors out of the proceeds of the stock that was exchanged with A.C.T. for its assets, prior to the proceeds being distributed to any stockholders, and the corporation being dissolved.  There was no dispute that a debt was due or about the amount of the initial debt, and A.C.T. declined to defend itself at trial, or in this appeal. The trial judge should not have assumed that A.C.T. was defunct, so that it could not have been held liable for its debts. We hold A.C.T. Services, Inc. jointly and severally liable with Nash Plumbing, Inc., for the judgment in favor of Shasco.

## CONCLUSION

¶20.　For the reasons set forth above, we affirm the trial court with regard to the liability of Nash Plumbing, but reverse and render with regard to the liability of Milton Nash, individually, and Nash Services Group (f/k/a Roto-Rooter).  We also reverse the trial court and render judgment here that A.C.T. is additionally liable to Shasco for the judgment.

¶21.    **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

   **SMITH, C.J., WALLER, P.J., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR.   EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.  DIAZ, J., NOT PARTICIPATING.**