# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-60309

CARPENTER PROPERTIES, INCORPORATED,

Plaintiff - Appellee

v.

JP MORGAN CHASE BANK NATIONAL ASSOCIATION,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**
May 4, 2016

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:07-CV-278

Before STEWART, Chief Judge, and OWEN and COSTA, Circuit Judges.

PER CURIAM:*

Plaintiff-Appellee Carpenter Properties, Inc. ("Carpenter") brought suit for breach of contract seeking payment of a market commission allegedly owed by Defendant-Appellant J.P. Morgan Chase Bank, N.A. ("Chase") based on a contractual agreement between Carpenter and Collegiate Funding Services

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-60309

LLC ("CFS").  Following Chase's acquisition of CFS,[1] the district court found Chase responsible for the debts and liabilities of CFS by piercing Chase's corporate veil.    The court awarded Carpenter contractual damages, prejudgment interest, punitive damages, and attorneys' fees and costs.  Chase appealed.  The judgment is REVERSED and RENDERED.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts

#### 1. The Exclusive Agency Contract

In December 2004, David Thompson, Director of Facilities for CFS, contacted Charles Polk, a real estate broker with GVA Advantis ("Advantis"), to assist CFS in finding a new location for its corporate headquarters in Jackson, Mississippi.[2]    CFS and Advantis contacted Phillip Carpenter, President of the commercial real estate company Carpenter Properties, Inc., to serve as the local commercial real estate company in Jackson.

On February 10, 2005, Carpenter and Advantis entered into a contract with CFS to be the exclusive agents for CFS's attempt to relocate to Jackson (the "Exclusive Agency Contract").  The agreement provided the following:

> This letter will serve to appoint Advantis of Richmond, VA and Carpenter Properties of Jackson, MS as the exclusive agents to represent our firm, Collegiate Funding Services, Inc. in the leasing of a new facility in or around Jackson, MS.
> As our agent, you shall enlist the best efforts of your firm to secure a location satisfactory to us.  We will refer all inquiries and offerings received by us either from principals, brokers, agents or others to you and all negotiations shall be conducted solely by you and your direction, subject to our final approval.

---

[1] After Chase acquired CFS and all of its shares, CFS continued as the surviving corporation and operated under the name Chase Educational Finance, or "CEF."  We refer to this surviving corporation as "CFS/CEF."

[2] CFS is an educational finance company that provides student loans and consolidation services.  Advantis is a commercial real estate company.

2

No. 15-60309

You will acquire the details on all contemplated or presently available locations and carefully select and present to us, those which in your opinion are most suitable for our occupancy including our present location. When we decide on the location, *you will negotiate the terms of the lease on our behalf in our interest.*
When a lease agreement for office space is consummated, *the Landlord will pay to Advantis and Carpenter Properties*, as Agents, a *market commission*, based on the rents to be received by the Landlord.
This agreement shall be for a *twelve (12) month term* and may be renewed by mutual agreement of the parties hereto.

On February 2, 2005, days prior to the execution of this agreement, Advantis and Carpenter sent Requests for Proposals ("RFPs") to various developers and builders in the Jackson metropolitan area for a facility. The proposal included, in part, the following:

Agency Disclosure/ Commission – Advantis and Carpenter Properties have been retained to represent Collegiate Funding Services. Please include a four (4%) percent commission based on gross rents to be received as a part of any lease proposal.

CFS approved the terms of the proposal prior to its distribution. In response to the RFPs, four developers expressed an interest in executing an agreement with CFS; relevant to this dispute is Parkway Development ("Parkway") and Richard Ambrosino ("Ambrosino"), President of Parkway.

On March 1, 2005, Carpenter and Advantis agreed to share any commission they received under the Exclusive Agency Contract equally ("Brokerage Agreement"). On May 2, 2005, Carpenter sent Ambrosino a proposed lease for CFS. Included in the proposed lease was a provision providing Carpenter with a commission rate of four percent of the aggregate rental for the entire lease term. The commission schedule stated that the final commission would be computed in accordance with the above rate of four percent.

In July 2005, one of the four business developers that responded to Carpenter's RFPs suffered an adverse judgment from the State Tax Commission and was involved in litigation in Mississippi. CFS, disappointed with the company's status, terminated its relationship with Carpenter.

*2. CFS Proposes to Amend the Exclusive Agency Contract*

On August 23, 2005, prior to reaching a final agreement to lease a space with any of the four developers, CFS terminated the Exclusive Agency Contract. CFS drafted a letter to Carpenter which identified CFS's obligation to Carpenter as follows:

> The relationship between Advantis, Carpenter Properties, Inc. and CFS shall not be an exclusive agency relationship. CFS may deal with or be represented by other brokers or developers. . .
>
> The obligation of CFS to you will extend only to circumstances in which CFS entered into a lease for a [facility] with the following individuals or entities related thereto:
> a. Claiborne Frazier and Frazier Development
> b. Campbell Real Estate and Tony Lasala
> c. Dick Ambrosino and Parkway Development
> d. Mark Jordan

CFS's letter made clear that Carpenter would only be entitled to the commission and other payments if CFS entered into a lease agreement with one of the four entities listed above or with any entities related to them. The Exclusive Agency Contract extended to February 10, 2006.

Following receipt of the Exclusive Agency Contract, Polk, of Advantis, and Thompson, of CFS, communicated via telephone and agreed to allow Carpenter to change the termination date of the Contract to February 10, 2007. On September 12, 2005, Carpenter changed the date, initialed the contract, and returned it to CFS (the "Amended Exclusive Agency Contract"). Neither party engaged in further correspondence after this date.

No. 15-60309

### 3. *Chase Acquires CFS*

On March 1, 2006, Chase[3] acquired CFS.[4]  CFS became a wholly-owned subsidiary of Chase and began operating under the name Chase Education Foundation ("CFS/ CEF").  The Merger Agreement stipulated the following:

      a. all the property, rights, immunities, powers and franchises of CFS and Cannon vest in CFS/CEF

      b. the debts, liabilities and duties of both CFS, Inc. and CEF became the debts, liabilities and duties of CFS/CEF.

      c. Chase acquired all shares of CFS.

### 4. *Chase Negotiates a Lease with Ambrosino/Sorrento and Parkway*

On May 11, 2006, Chase and Parkway, through its owner Ambrosino, submitted a lease proposal for CFS to Chase Bank that differed from a proposal previously offered in response to the RFPs sent to CFS; CFS would lease Ambrosino's Galleria property.  The proposal contained no provision for realtor fees and specified that Chase would be responsible for any such fees.[5]  A Chase employee in charge of finding a location for CFS drafted a Project Funding Approval Form that included a ten-year lease of the Galleria Property and stipulated a four percent brokers' commission of $515,141.00.

On November 9, 2006, Chase and Parkway, through Parkway's affiliate Sorrento I, LLC ("Sorrento") entered into a lease agreement.[6]  The agreement specified that the lease "Tenant" has had no dealings with real estate brokers

---

[3] Chase is a federally chartered national banking association.

[4] CFS and Cannon Acquisition Corporation ("Cannon") entered into an Agreement and Plan of Merger ("Merger Agreement") with Chase.  Cannon was a direct wholly-owned subsidiary of Chase and was formed solely for the purpose of engaging in the merger. Cannon, which merged with CFS, ceased to exist as a separate corporate entity and CFS survived as the surviving corporation of the merger.

[5] Parkway submitted a previous proposal to Chase in February 2005.  The RFP that Parkway returned pertained to leasing space to CFS on Galleria Parkway.  The proposal included a provision specifying a four percent commission.

[6] Ambrosino owns both Parkway, a real estate brokerage firm, and Sorrento, an associated company.  Parkway buys the land and transfers it to an associated company such as Sorrento, which functions as the landlord, as it did in the instant case.

or finders, except Advantis, and anyone claiming through Advantis. The lease also provided that the "Landlord" (Sorrento) is not obligated to pay, and shall be held harmless by the Tenant against any fees, damages, claims or demands made upon it on behalf of any real estate broker or finder with whom the Tenant purportedly has dealt with. In an addendum to the November 9 lease, Chase signed as the "Tenant" of the Galleria Property.

Carpenter states that at no point did Chase inform Carpenter of its agreement with Ambrosino and Sorrento. Carpenter received no commissions from this lease. Chase, and not CFS/CEF, entered into the lease agreement for the Madison facility.

**B. Procedural History**

On April 16, 2007, Carpenter filed suit against CFS in Mississippi state court for breach of the exclusive agency brokerage contract. The case was removed to the Southern District of Mississippi, where the court allowed Carpenter to substitute Chase as the defendant. The parties agreed to trial before the district court based on the parties' joint stipulations, depositions, and exhibits, and requested that the district court resolve any factual issues based on the record submitted by the parties.

On March 30, 2015, the district court entered judgment for Carpenter, finding that Chase breached the Exclusive Agency Contract and was liable for damages on the contract. Based on the alleged breach, the court awarded Carpenter contractual damages in the amount of $256,253.87, prejudgment interest in the amount of $232,253.77, punitive damages in the amount of $1,000.00, and attorneys' fees and costs. Chase timely appeals.

There are five issues on appeal: whether the district court (1) erred in finding a breach of the Exclusive Agency Contract rendering CFS liable; (2) erred in piercing the corporate veil to hold Chase liable for CFS's purported

breach of contract; (3) erred in finding that the price term "market commission" in the Exclusive Agency Contract was sufficiently definite to be enforceable; (4) abused its discretion in determining that the prevailing market commissions constitute liquidated damages for the purposes of a prejudgment interest award; and (5) abused its discretion in awarding punitive damages.

## II.     Standard of Review

In reviewing a district court's final judgment following a bench trial, we review findings of fact for clear error and review conclusions of law *de novo*. *Mid-Continent Cas. Co. v. Davis*, 683 F.3d 651, 654 (5th Cir. 2012).  A factual finding is clearly erroneous when the court has "a definite and firm conviction that a mistake has been made."  *Sunbeam Oster Co. v. Whitehurst*, 102 F.3d 1368, 1373 (5th Cir. 1996).  We review a district court's decision to pierce the corporate veil for clear error.  *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 647 (5th Cir. 2002); *Zahra Spiritual Tr. v. United States*, 910 F.2d 240, 242 (5th Cir. 1990).  "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Davis*, 683 F.3d at 654.

## III.    Analysis

### A. CFS/CEF Liability

Carpenter contends that the district court did not err in finding that Chase breached the Exclusive Agency Contract.  Before we reach Chase's liability, however, we must determine whether CFS/CEF, its wholly owned subsidiary, retained the liability of CFS following its merger.  CFS/CEF remains liable if a valid contract existed between the parties after February 6, 2010.[7]  The district court's interpretation of a contract, including whether a

---

[7] The crux of Carpenter's argument is that a valid contract existed where the parties amended the Exclusive Agency Contract to terminate on February 10, 2007, as opposed to February 10, 2006.

contract is ambiguous, is a question of law which is reviewed *de novo*. *Exxon Corp. v. Crosby-Miss. Res., Ltd.*, 154 F.3d 202, 209 (5th Cir. 1998); *Carl E. Woodward, L.L.C. v. Acceptance Indem. Ins. Co.*, 743 F.3d 91, 95 (5th Cir.) *reh'g denied*, 749 F.3d 395 (5th Cir. 2014).  If a contract is ambiguous, subsequent interpretation of the contract becomes a question of fact, which the courts review for clear error. *Exxon Corp.*, 154 F.3d at 207.  Whether a contract was modified is a question of fact to be resolved by the finder of fact.  *DC Gen. Contractors, Inc. v. Slay Steel, Inc.*, 109 So. 3d 577, 583 (Miss. Ct. App. 2013); *Coastal Devs., Inv. v. Dedeaux*, 114 So. 3d 764, 764 n.4 (Miss. Ct. App. 2013).

At its core, a contract requires (1) an offer and acceptance, (2) consideration, (3) an agreement that is sufficiently definite, (4) mutual assent, and (5) no legal prohibition precluding contract formation.  *See Grenada Living Ctr., LLC v. Coleman*, 961 So. 2d 33, 37 (Miss. 2007).  Failure to communicate acceptance of a contract is "fatal to creation of a valid contract."  *Anderton v. Bus. Aircraft, Inc.*, 650 So. 2d 473, 476 (Miss. 1995).  A contract need not be signed to signify mutual assent but may be validly formed based on the actions of the parties.  *Turney v. Marion Cty. Bd. of Educ.*, 481 So. 2d 770, 774 (Miss. 1985).  Under Mississippi law, the actions of the parties following contract formation "may support a finding that the original contract has been modified to an extent consistent with the subsequent course of conduct."  *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 213 (5th Cir. 2009) (quoting *Fletcher v. U.S. Rest. Props., Inc.*, 881 So. 2d 333, 337 (Miss. Ct. App. 2004)).

The parties do not dispute that the Exclusive Agency Contract existed between CFS, Advantis and Carpenter, whereby Carpenter and Advantis would serve as the exclusive agents for CFS in leasing a new facility.  What we must first determine is whether the district court erred in finding a breach of the Exclusive Agency Contract rendering CFS liable.

No. 15-60309

Carpenter's August 23, 2005, written notation on the Exclusive Agency Contract can be construed as modifying the initial Exclusive Agency Contract. While a contract may be modified after formation, it must comply with the requirements of a valid contract. *Anderton*, 650 So. 2d at 476. Among these requirements is mutual assent between the parties. *Turney*, 481 So. 2d at 774. In the instant case, Chase argues that the Exclusive Agency Contract was not modified because CFS did not assent to the changed terms. As the district court noted, there is no document before the court that shows that CFS "counter-signed" the document after receiving Carpenter's counteroffer. However, the mere fact that CFS did not counter-sign the document is not dispositive. *See Byrd v. Simmons*, 5 So. 3d 384, 389 (Miss. 2009) ("[A] signature is not always essential to the binding force of an agreement, and whether a writing constitutes a binding contract even though it is not signed or whether the signing of the instrument is a condition precedent to its becoming a binding contract usually depends on the intention of the parties. The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, as, for example, by the acts or conduct of the parties." (quoting *Turney*, 481 So. 2d at 74)).

Although it would initially appear that no agreement existed among the parties because Carpenter changed the date and mailed it back to CFS, who provided no response to Carpenter, mutual assent is present. In review of the record, we conclude that the initialed change on the amended Exclusive Agency Contract was made pursuant to negotiations between Carpenter, Advantis and CFS. *Cf. id.* at 390 (finding no agreement where a party's authorized representatives never signed an arbitration agreement because the parties' conduct was inconsistent with an agreement having been formed). Chase has not denied that Thompson had power to authorize the modification on behalf

9

of CFS. Moreover, Thompson, who was CFS's Director of Facilities and the individual responsible for overseeing negotiations with CFS, approved this course of action. Accordingly, CFS was a party to these negotiations. Polk/Advantis similarly attested that CFS gave Carpenter permission to change the termination date. This conduct, coupled with Carpenter's continued attempts to negotiate lease agreements on behalf of Carpenter following the modification, is sufficient to show mutual assent and an intent to be bound.

Chase also argues that the Exclusive Agency Contract is unenforceable as a matter of law because the price term, "market commission," is indefinite. Chase argues that market commission cannot be a definite term because the commission received is determined by a future negotiation by Advantis and Carpenter with the future Landlord, not with CFS. Chase also criticizes the district court's attempt to determine the governing market rate because its attempt to do so departs from the Agreement's explicit terms and creates a new standard of determining the rate—identifying the "prevailing" market rate. Carpenter, on the other hand, argues that the term "market commission" is a sufficiently definite term because the parties stipulated that four percent was within the reasonable rate of a market commission and even if the term is ambiguous, it is clear based on internal documents and expert witness opinions that the market commission equated to four percent.

In construing a contract, vague, indefinite and uncertain agreements which do not identify the promises and required performances of those involved are not enforceable. *Massengill v. Guardian Mgmt. Co.*, 19 F.3d 196, 202 (5th Cir. 1994). Notwithstanding this rule, Mississippi law does not require that a price term be explicitly stated if the contract contemplates a method of determining the consideration or price term. *See Duke v. Whatley*, 580 So. 2d

1267, 1273 (Miss. 1991). "If one familiar with elementary principles of mathematical reasoning may deduce the price with certainty," Mississippi courts will enforce the contract. *Denbury Onshore, LLC v. Precision Welding, Inc.*, 98 So. 3d 449, 454 (Miss. 2012), *as modified on denial of reh'g* (Oct. 11, 2012).

We conclude that the agreement between CFS/CEF and Carpenter contemplates a method of determining the price term. The Exclusive Agency Contract specified that upon the consummation of a lease agreement with CFS, the Landlord would pay to Advantis and Carpenter Properties, as Agents, a market commission, based on the rents to be received by the Landlord. *But see Duke*, 580 So. 2d at 1271–73. The record also contains evidence which shows that (1) the initial RFP circulated by Carpenter includes a four percent commission that was approved by CFS; (2) a Project Funding Approval Form, drafted by a Chase employee and submitted on behalf of CFS/CEF in a lease proposal, includes language which explains the commission as "a potential brokerage commission due, which is estimated at . . . 4%"; and (3) Carpenter presented an expert opinion showing that the prevailing market rate for a real estate commission in Jackson is four percent.[8]

In order for the court to determine the final commission under the contract, the court need only determine the prevailing market rate for commercial real estate commissions and apply that percentage to the total rent. The instant case is distinguishable from *Duke* because this case involves an agency agreement where commission is determined by a market rate, and not a purchase and sale agreement where the parties form "an agreement to

---

[8] In fact, CFS and Carpenter initially entered into an agreement by accepting the rate sheet CFS supplied, providing for a four percent commission. The scope of the bid went no further than this agreement. *See Denbury Onshore, LLC v. Precision Welding, Inc.*, 98 So. 3d 449, 454 (Miss. 2012), *as modified on denial of reh'g* (Oct. 11, 2012).

agree" at a later date. *See Duke*, 580 So. 2d at 1273. If we were to define "market commission" as a "negotiated commission" or as solely "commission," "market" would be rendered meaningless.

Accordingly, at the time of the execution of the contract, the market rate in Jackson was four percent of the gross rental amount payable under the lease agreement. With this in mind, the court is able to calculate a final market commission based on the rents to be received by the landlord: market commission rate (4%) x aggregate rents = total commission due. The district court did not err as it could calculate market commission with certainty.

Because the Exclusive Agency Contract was properly modified and was sufficiently definite, we must next determine whether the contract applies to CFS/CEF. The parties explicitly agreed that the pre-existing liabilities or duties that CFS owed were not extinguished by the merger between CFS and Cannon. The Merger Agreement states:

> All the property, rights, privileges, immunities, powers and franchises of [CFS] and [Cannon] shall vest in the Surviving Corporation [CFS/CEF] and all debts, liabilities and duties of [CFS] and [Cannon] shall become the debts, liabilities and duties of the Surviving Corporation [CFS/CEF].

CFS/CEF remained liable for CFS's obligations under the Amended Exclusive Agency Contract. *See Palmere v. Curtis*, 789 So. 2d 126, 130 (Miss. Ct. App. 2001) ("A 'court is obligated to enforce a contract executed by legally competent parties where the terms of the contract are clear and unambiguous.'").

**B. Chase Liability**

We next address Carpenter's second issue: whether the district court erred in piercing Chase's corporate veil to hold it liable for the debts and obligations of its wholly owned subsidiary, CFS/CEF. There is no question that "Mississippi case law generally favors maintaining corporate entities and

avoiding attempts to pierce the corporate veil." *Canadian Nat'l Ry. Co. v. Waltman*, 94 So. 3d 1111, 1115 (Miss. 2012) (quoting *Buchanan v. Ameristar Casino Vicksburg, Inc.*, 957 So. 2d 969, 977 (Miss. 2007)). It is not lightly undertaken because of "the chilling effect it has on corporate risk-taking." *Buchanan*, 957 So. 2d at 977 (*quoting Nash Plumbing, Inc. v. Shasco Wholesale Supply, Inc.*, 875 So. 2d 1077, 1082 (Miss. 2004)). Accordingly, "Mississippi courts decline to pierce the corporate veil except in those extraordinary factual circumstances where to do otherwise would subvert the ends of justice." *Penn Nat'l Gaming, Inc. v. Ratliff*, 954 So. 2d 427, 431 (Miss. 2007).

In contract disputes, the corporate entity will not be disregarded unless the complaining party can demonstrate the existence of the following three factors: "(1) some frustration of expectations regarding the party to whom he looked for performance; (2) the flagrant disregard of corporate formalities by the defendant corporation and its principals; and (3) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder." *Waltman*, 94 So. 3d at 1115 (quoting *Ratliff*, 954 So. 2d at 431); *Gray v. Edgewater Landing, Inc.*, 541 So. 2d 1044, 1047 (Miss. 1989). The corporate veil will not be pierced except where there is some abuse of the corporate form itself. *Ratliff*, 954 So. 2d at 432. The main issue on appeal stems from whether the first factor been met. That is, our inquiry focuses on whether Carpenter knew it was contracting with CFS, rather than Chase, and which entity Carpenter expected to pay commission under the contract.

To establish this first requirement in order to pierce the corporate veil, a plaintiff must put forth evidence showing that the plaintiff had a reasonable expectation of contractual performance from the party behind the veil (here, allegedly, Chase). *Gray*, 541 So. 2d at 1047; *Powertrain, Inc. v. Ma*, 88 F. Supp. 3d 679, 697 (N.D. Miss. 2015). Mississippi case law almost exclusively

addresses situations where plaintiffs were fully aware of who they were contracting with at the point of contract formation, but few address changes in expectations following contract formation. *See, e.g.*, *Gen. Motors Acceptance Corp. v. Bates*, 954 F.2d 1081, 1085 (5th Cir. 1992) (finding that frustration of purpose may be found where a corporation purposefully conceals its true persona and identity); *Buchanan*, 957 So. 2d at 980 ("[Plaintiff] did not show any frustration of contractual expectations regarding the party to whom she looked for performance [because the plaintiff] had no contractual expectation regarding [the defendant corporation]."); *Rosson v. McFarland*, 962 So. 2d 1279, 1285–86 (Miss. 2007) (finding that the plaintiff's expectations were not frustrated where (1) the plaintiff questioned the company's owner prior to executing a contract and conceded that he knew he was contracting with the company and not its owner; (2) the plaintiff did not look to the company's owner individually for performance or require the owner to guarantee the performance of the company; and (3) all supplies and materials were paid for though the company, and not the owner); *Richardson v. Jenkins Builders, Inc.*, 737 So. 2d 1030, 1032 (Miss. Ct. App. 1999).

Carpenter relies on *Thames & Co. v. Eichner*, 373 So. 2d 1033 (Miss. 1979), to argue that it was unaware of who the real party at interest (here, allegedly, Chase) was until after Carpenter and CFS had formed a contract. In *Thames*, the president and owner of Thames executed a deed conveying a house to the buyers. *Id.* at 1035. Following the near destruction of the home, and due to a breach by the owner, the buyers sought to look past Thames, the builder-vendor, to hold the owner individually liable for a breach of contract. *Id.* The court, in holding the owner liable, found that (1) the buyers knew only of the owner during all negotiations and had no knowledge of or contact with Thames until the date of closing of a contract; (2) the owner held all of the stock

14

in the company; and (3) the owner treated the company as if it did not exist. *Id.* The court concluded that Thames was nothing more than an alter ego, and held the owner liable because the plaintiff solely looked to her for performance. *Id.*; *cf. Gray*, 541 So. 2d at 1047 (finding that plaintiff failed to show a frustration of purpose, despite a change in ownership following contract formation, because the party had no doubt who he was contracting with).

Mississippi court have nonetheless declined to pierce the corporate veil under a frustration of purpose theory even where plaintiffs allege confusion about events occurring after the formation of a contract. In *Rest. of Hattiesburg, LLC v. Hotel & Rest. Supply, Inc.*, the court's inquiry focused on whether a corporation, HRS, knew it was contracting with a particular LLC, Restaurant of Jackson, rather than another third party. 84 So. 3d 32, 40 (Miss. Ct. App. 2012). Relying on *Thames*, plaintiffs argued that they were confused about the real party providing supplies under their contract. *Id.* However, the court found no undisputable display of a frustration of purpose where plaintiff did not know of or deal with the alleged party behind the veil until after plaintiff entered into the contract and tried to collect on past due accounts. *Id.* (reversing the district court's grant of summary judgment in favor of plaintiffs and remanding to the district court for further proceedings); *Foamex, L.P. v. Superior Products Sales, Inc.*, 361 F. Supp. 2d 576, 578 (N.D. Miss. 2005) ("[T]here is a rather fine line between cases in which those courts have permitted a piercing of the corporate veil and those cases in which they have refused to permit such.").

The facts of this case do not lend itself to triggering the extraordinary remedy of piercing the corporate veil because "a critical distinction the Court relied upon in *Thames* . . . does not exist here." *Rosson*, 962 So. 2d at 1285. The *Thames C*ourt allowed for the piercing of Thames's corporate veil to hold

its owner liable because the buyers "had never heard of Thames until the closing, and they communicated only with [the owner] throughout the contracting period." *Id.*  Here, Carpenter offered no proof of a contractual relationship with anyone except CFS.  While Chase acted on behalf of CFS/CEF to acquire a leased space, this occurred after all negotiations between CFS and Carpenter, and Carpenter did not so much as interact with Chase or its representatives until it attempted to enforce the contract and recover a commission.

The weight of Mississippi precedent indicates that, in order for prong one of *Gray* to be met, plaintiffs must show that it knew of or dealt with the alleged party behind the veil prior to or in the course of entering into a contract, or prior to an attempt to enforce a contract.  In finding Chase liable, however, the district court stated that "subsequent events confused Carpenter Properties about the party to whom it should look for performance.  CFS merged with Cannon, a Chase Bank subsidiary, and changed its name to CEF.  Further Chase began acting on behalf of CEF in seeking out a new property."  Despite this subsequent merger and acquisition, neither Carpenter nor the district court identify adequate record support, under current Mississippi case law, which would sustain Chase's liability on appeal.  The court premised its conclusion on the presupposition that *Gray* hinted that subsequent events might cause confusion about the party possessing a contractual obligation.  However, the mere frustration with Chase for its failure to pay a commission once Chase's identity was known is insufficient to amount to frustration of contractual expectations regarding the party to whom Carpenter looked for performance leading up to and throughout Carpenter's interaction with CFS. *See, e.g.*, *Brown v. Waldron*, No. 2014-CA–01036–COA, 2016 WL 785437, at *4 (Miss. Ct. App. Mar. 1, 2016).

16

As an *Erie* Court charged with construing Mississippi law, we are unpersuaded that the changed positions of the parties in this case were so extreme as to warrant widening the narrow legal premise under which Mississippi courts sanction the extraordinary procedure of piercing the corporate veil.[9]   Stated otherwise, the virtually arm's length nature of the underlying real estate transaction does not mirror circumstances where the Mississippi courts have pierced the corporate veil.  *Compare Thames*, 373 So. 2d at 1035, *with Rosson*, 962 So. 2d at 1286, *and Brown*, 186 So. 3d at 960–61. "The courts have reserved piercing the veil . . . for 'factual circumstances which are clearly extraordinary—where to do otherwise would 'subvert the ends of justice.'" *Gray*, 541 So. 2d at 1046 (quoting *Johnson & Higgins of Miss., Inc. v. Comm'r of Ins.*, 321 So. 2d 281, 284 (Miss. 1975)).  At this juncture, none of the relevant Mississippi precedent directly or indirectly command piercing the corporate veil based on the stipulated trial record.  The district court's reliance on an implication from *Gray*, and its adoption of Carpenter's theory of recovery, is misplaced.  Moreover, although Carpenter's failure to initially name Chase in its suit is not a procedural bar, the failure to name Chase tends to undercut Carpenter's argument that it expected that Chase would be responsible for paying the debt.  *See Rest. of Hattiesburg, LLC*, 84 So. 3d at 41.

Accordingly, the district court erred in finding as a matter of law that Carpenter could show a frustration of contractual expectations from Chase.

---

[9] Where a point of state law is unsettled, *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) requires that we determine how the Mississippi Supreme Court would interpret its own law if presented with the question.  *Lawrence v. Virginia Ins. Reciprocal*, 979 F.2d 1053, 1055 (5th Cir. 1992) (citing *American Waste & Pollution Control Co. v. Browning–Ferris, Inc.*, 949 F.2d 1384, 1386 (5th Cir. 1991)). "When we are required to make an *Erie* guess, it is not our role to create or modify state law, rather only to predict it."  *Id.*; *Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394, 397 (5th Cir. 1986) ("We are emphatically not permitted to do merely what we think best; we must do that which we think the Mississippi Supreme Court would deem best.").

Because Carpenter's failure to show the existence of the first *Gray* prong is sufficient to reverse, we need not address the second and third prongs under *Gray*, and decline to uphold the district court's veil piercing based on this theory. Similarly, we decline to reach Carpenter's remaining issues on appeal, as each is predicated on first finding Chase liable by piercing its corporate veil.

## IV. Conclusion

The judgment of the district court is REVERSED and RENDERED in favor of Chase.