# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-01107-SCT

## CONSOLIDATED WITH

## NO. 2004-CA-00078-SCT

*JULIE ROSSON*

*v.*

*DR. MARK McFARLAND*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/30/2006 |
| TRIAL JUDGE: | HON. STEPHEN B. SIMPSON |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOE SAM OWEN |
| ATTORNEY FOR APPELLEE: | S. CHRISTOPHER FARRIS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | ON DIRECT APPEAL: REVERSED AND RENDERED; ON CROSS-APPEAL: DISMISSED - 08/23/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., DICKINSON AND RANDOLPH, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1.    In 1999, Dr. Mark McFarland filed a Complaint in the Circuit Court of Hancock County against Acadian Bay Development, Inc. ("Acadian Bay"), and Julie Rosson, individually ("Rosson"). McFarland pleaded that Acadian Bay and Rosson each breached

their contractual obligations, that they negligently failed to construct his home in a fit and workmanlike manner, and that they made false representations to induce McFarland to enter into the contract to build his home.

¶2. Subsequently, McFarland filed an amended complaint adding Time Warner, Inc., alleging it to be the parent company of Southern Living magazine. McFarland obtained the plans for building his home from Southern Living.

¶3. Following discovery and more than three years later, a second amended complaint was filed omitting Time Warner, Inc., as a defendant, but naming Southern Living, Inc. ("Southern Living") as a defendant. The second amended complaint also named Julie Rosson Builder, Inc. as an additional defendant and alleged that all defendants made material misrepresentations and were guilty of fraud and deceptive advertising in addition to breach of contract. No claim was pleaded to pierce the corporate veil nor was there any claim to utilize an "alter ego" theory to impose individual liability.

¶4. During trial, Southern Living settled for $100,000. At the conclusion of McFarland's case-in-chief and after final close, the remaining defendants moved for directed verdicts, which were denied by the trial court. The jury returned a verdict of $325,000, but only against Rosson as an individual. Rosson was then given credit for the settlement payment by Southern Living, and the verdict was reduced by agreement. Final judgment was entered against only Rosson, individually, for $225,000.

¶5. Rosson filed a combined motion and memorandum for judgment notwithstanding the verdict (JNOV), or in the alternative, for a new trial, or a remittur, and McFarland filed a

2

motion for assessment of attorney fees and expert witness fees, as well as a motion for new trial on the issue of punitive damages. All post-trial motions were denied by the trial court.

¶6. Rosson appealed. McFarland cross-appealed claiming the trial court erred in its decision to not allow the jury to hear the issue of punitive damages and also in its denial of a new trial on the issue of punitive damages and attorney's expert witness fees.

¶7. Subsequent to the appeal, Rosson allegedly discovered evidence McFarland withheld at trial.[1] Reviewing the record on appeal, this Court, *sua sponte*, found that a final judgment had not been entered. The final judgment from which Rosson appealed failed to address the corporate defendants Acadian Bay or Julie Rosson Builder, Inc., and was not certified as final under M.R.C.P. 54(b). *See **Salts v. Gulf Nat'l Life Ins. Co.,*** 849 So. 2d 848, 850-51 (Miss. 2002).

¶8. This Court dismissed the appeal for lack of jurisdiction, since a certified final judgment was not entered by the trial court. *See **Rosson v. McFarland,*** 933 So. 2d 969 (Miss. 2006). Subsequently, Rosson filed a Motion for Correction of Final Judgment, to which McFarland agreed. The trial court granted the motion.

¶9. The trial court entered a Corrected Final Judgment, which found the following:

 (a) McFarland was, after a credit of the $100,000 settlement with Southern Living, Inc., entitled to recover damages against Julie Rosson, individually, for

---

[1]Rosson then filed a Rule 60(b)(1), (3), and (6) Motion to Set Aside Final Judgment and Other Relief, or Alternatively, a New Trial. Rosson twice supplemented the Rule 60(b) Motion. Rosson then filed a Motion to Extend, Stay and Abate Briefing Schedule pending a ruling by the trial court on her Rule 60(b) Motion. A hearing was ultimately held on Rosson's Rule 60(b) Motion, and the Motion was denied by the trial court. As this evidence was not integral to this Court's decision, we decline to address it.

the sum of $225,000, plus interest at the legal rate from the date of the original judgment of October 6, 2003, and costs of court.

(b) Judgment was entered for Acadian Bay Development, Inc. and Julie Rosson Builder, Inc. and all claims as to these defendants were dismissed with prejudice.

(c) Finally, it was ordered and adjudged that judgment be entered for all defendants, Acadian Bay Development, Inc., Julie Rosson Builder, Inc. and Julie Rosson, individually, as to attorney's fees/expert witness' fees and punitive damage claims as the trial court determined prior to submission to the jury that these claims should not be considered by the jury.

¶10.    The trial court also adopted its previous findings and ruling on Rosson's Rule 60(b)(1), (3) and (6) Motion to Set Aside Final Judgment or, Alternatively, a New Trial. The trial court re-stated that the evidence not produced at trial was not prejudicial in light of its cumulative nature and denied Rosson's motion.

¶11.    Julie Rosson appeals from the Corrected Final Judgment. One issue presented is dispositive of this case. Therefore, we will address only the following issue:[2]

I.    Whether the lower court erred by not directing a verdict for Rosson and allowing McFarland to pierce the corporate veil of Acadian Bay Development, Inc.

**FACTS**

¶12.    McFarland purchased three adjacent lots in Diamondhead, Mississippi, with the intent to build his first home there.  Through his subscription to Southern Living magazine, McFarland examined several home designs advertised by the magazine as Southern Living

---

[2]McFarland raised the following issue on cross-appeal: Whether the lower court erred in not allowing the jury to consider an award of punitive damages and/or in not awarding attorney's fees. As the Court has found that damages should not have been awarded against Rosson individually, the cross-appeal is moot.

4

Idea Homes and Southern Living Custom Homes. McFarland chose the Crabapple Cottage Alternate home plan as the home he would like to build and purchased a set of blueprints from Southern Living.

¶13. When McFarland received the blueprints, he also received promotional literature from Southern Living. This literature included Southern Living's recommendation of home builders in various states. Southern Living recommended Julie Rosson Builders, Inc., as one of its builders in Mississippi. McFarland testified that he spoke with a representative of Southern Living's Custom Home program, who stated the builders recommended by Southern Living had to meet strict standards and guidelines in order to be eligible for the program.

¶14. Subsequently, McFarland contacted Rosson, the president and sole shareholder of Julie Rosson Builder, Inc., and met her at her Waveland home to view the caliber of its construction.

¶15. McFarland presented the Southern Living blueprints and specified the materials he wanted to be used for his home. Rosson acknowledged that she was aware that McFarland had a Southern Living home plan. However, she said the fact that Julie Rosson Builder, Inc., was a recommended Southern Living home builder was only "mentioned a time or two" and that the initial contact did not focus on McFarland's conversations with Southern Living.

¶16. During their initial meeting, McFarland agreed to pay $306,000 to have the Crabapple Cottage Alternate home built. After visiting Rosson's home and another home built by her company, McFarland executed a construction contract with Acadian Bay, a separate company of which Rosson was the president and sole shareholder. The last page of

5

the contract contained a separate allowance provision for lighting and various other materials, although McFarland testified he understood the contract price to include all Southern Living sponsored products.

¶17. The undated contract was executed in the fall of 1997. The home was completed in June of 1998. In 1998, Rosson owned 100% of the stock in three separate building companies, which used the same phone number and address. These companies were: Acadian Bay; Julie Rosson Builder, Inc., and Good Earth Builders, Inc. ("Good Earth"). Rosson testified that most of her building construction on the Mississippi Gulf Coast, the location of McFarland's home, was performed by Acadian Bay. Homes constructed in Jackson, Mississippi, were built by Julie Rosson Builder, Inc. McFarland's construction contract to build the coastal home was entered into with Acadian Bay, and was signed by "Julie Rosson, President." The contract erroneously recited that the home was to be built in the Acadian Bay subdivision. McFarland's home was not being built in Acadian Bay subdivision, but rather in Diamondhead. Rosson stated that McFarland executed her company's standard contract, and it was "an error, a typo" to state that McFarland's home was being built in Acadian Bay. Rosson testified that at the time the contract was signed, McFarland was aware that he was contracting with Acadian Bay. McFarland affirmed this in his testimony. He admitted questioning Rosson about why the contract was with Acadian Bay instead of Julie Rosson Builder, Inc., as listed in the Southern Living advertisement. McFarland stated Rosson told him, "Right now I am operating as Acadian Bay, Inc., but this is still affiliated with Southern Living." Included with the construction contract was a Description of Materials executed by: "Acadian Bay Development, Inc., Julie Rosson, President."

¶18.    Shortly after construction began, McFarland complained of problems with the home and deviations from the Southern Living home plans. McFarland identified problems with foundation, leakage and mildew, termites, windows, and heating and air conditioning units. McFarland complained of substantial deviations from the Southern Living plans, including: the outside trim; single, instead of double pane, windows; the absence of an inside balcony; and the absence of gutters. At trial, McFarland's three expert witnesses testified the deficiencies were the result of poor craftsmanship. McFarland testified he had paid $306,000 for a home that was worthless and had no resale value. Upon cross-examination, McFarland stated he realized there were numerous problems before closing; yet he did not raise all of those problems at the time of closing. McFarland was living in the house at the time of trial. McFarland also alleged the problems associated with the house caused him financial and emotional distress.

¶19.    In response, the defendants' expert witnesses admitted there were deficiencies in the home; however, they said these deficiencies did not rise to the level stated by McFarland and that repairs could be made in a cost-effective manner. The defendants produced a letter, issued on Acadian Bay stationery, dated July 14, 1999, stating that it would make the necessary repairs. However, McFarland had refused to allow anyone affiliated with the defendants on the property. He "did not feel comfortable" letting the defendants or their subcontractors onto his property to make corrections.

**ANALYSIS**

I.      **Whether the lower court erred by not directing a verdict for Rosson and allowing McFarland to pierce the corporate veil of Acadian Bay Development, Inc**.

7

¶20. "In considering a motion for a directed verdict, this Court must consider whether the evidence in opposition to the motion was of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment could differ as to the verdict. If so, the motion must be denied and the verdict will stand." *Collins v. Ringwald,* 502 So. 2d 677, 678 (Miss. 1987). Furthermore, this review "requires consideration of the evidence before the court when made, [and] this Court properly reviews the ruling on the last occasion the challenge was made in the trial court." *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993). Here, we review the denial of a JNOV.

¶21. The issue before this Court is whether Rosson should incur individual liability *vel non* regarding the faulty construction of McFarland's home. Stated otherwise, was there sufficient testimony, along with all reasonable inferences which can be drawn therefrom, to support a directed verdict against Rosson, individually, pursuant to this Court's holding in *Gray v. Edgewater Landing, Inc.*, 541 So. 2d 1044, 1046 (Miss. 1989)?

¶22. As early as 1933, this Court stated, "A corporation is [an] entity separate and distinct from its stockholders." *Ill. Cent. RR. v. Miss. Cottonseed Prod., Co.,* 166 Miss. 579, 148 So. 371, 372 (1933). As do most courts, this Court has reserved piercing the corporate veil for factual circumstances which are clearly extraordinary, and the "distinct corporate identity will be maintained unless to do so would subvert the ends of justice."*Johnson & Higgins v. Commissioner of Ins. of Miss.,* 321 So. 2d 281, 284 (Miss. 1975) *See also* Stephen Presser, *Piercing the Corporate Veil*, 2-292 (Thomson/West March 2007). Commentators have noted, "Among [Mississippi] court's reports may be found a long string of decisions reflecting our law's commitment to the legal integrity of the corporate entity -- and the concomitant limited

liability of shareholders." Presser, *Piercing the Corporate Veil*, 2-292. When examining the facts before this Court today, we are mindful that,

> Where, in the context of an action for breach of a lease or other consensual undertaking, a party seeks to pierce the veil of the corporation with whom he has contracted and to hold the shareholders personally liable, our focus is fixed upon the expectations of the parties in concluding the bargain. Since contract liability arises from an essentially consensual relationship, courts generally decline to disregard the corporate entity, choosing instead to enforce the contract as written.

***Gray v. Edgewater Landing, Inc***., 541 So. 2d 1044, 1046 (Miss. 1989).

¶23.   Under Mississippi law, to pierce the corporate veil, one must demonstrate:

> a) Some frustration of contractual expectations regarding the party to whom he looked for performance; b) the flagrant disregard of corporate formalities by the defendant corporation and its principals; and c) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder.

***Gray,*** 541 So. 2d at 1047.  "To present a jury issue on a demand that the corporate veil be pierced, a party must present some credible evidence on each of these points." ***Id.***

**A)     Some frustration of contractual expectations regarding the party to whom he looked for performance.**

¶24.   In the fall of 1997, McFarland entered into a contract with Acadian Bay Development, Inc. to build a house. McFarland received plans for this house from Southern Living along with the name of Julie Rosson Builder, Inc. McFarland stated when he received the plans for his home from Southern Living, they recommended Julie Rosson Builder, Inc. McFarland contacted Ada Love, a representative of Southern Living, and she recommended Julie Rosson Builder, Inc., to McFarland. McFarland made an appointment with Rosson, the president of Julie Rosson Builder, Inc. and Acadian Bay Development, Inc., with whom he later contracted to build his home.

¶25. The testimony is uncontraverted that the contract was between McFarland and Acadian Bay, a company owned by Rosson. The contract contains bold lettering on the heading, as well as in numerous paragraphs, identifying "Acadian Bay Development, Inc." McFarland conceded that he knew the contract was with Acadian Bay and he questioned Rosson on this point. Rosson told him *before* he executed the contract that she was building homes in the Coast area through this company. Although Rosson stated she did not distinguish for McFarland which of the three corporations with which he was dealing, McFarland had sought out Julie Rosson Builder, Inc., on the recommendation of Southern Living for the construction of his home. He admitted in testimony, however, that he was aware that the contract was executed with Acadian Bay, through its president, Rosson. In his testimony, McFarland conceded he did not demand that Rosson individually guarantee the performance of the contract by Acadian Bay, nor that Rosson personally guarantee the construction on the home. Further, McFarland testified he paid Acadian Bay for construction. All supplies and materials for construction were paid for through an Acadian Bay checking account. However, McFarland said he consulted with Rosson during the building of his home.

¶26. In *Gray,* this Court found that Gray failed to meet this first prong for piercing the corporate veil. "First, Gray admits that, despite the change in ownership, he had no doubt that he was contracting with a corporate party, not [the defendants] personally." *Id.* at 1047. In their testimony, both McFarland and Rosson stated that when they went over the contract, McFarland understood he was contracting with Acadian Bay. McFarland argues that he looked to Rosson for guidance throughout the building process, and relies on *Thames v.*

10

*Eicher*, 373 So. 2d 1033 (Miss. 1979). However, a critical distinction the Court relied upon in *Thames* does not exist here. The Eichers had never heard of Thames until the closing, and they communicated only with Mrs. Rogers throughout the contracting period. During trial, McFarland offered no proof of a contractual relationship with anyone except Acadian Bay, and "[t]his court has held that where parties to a transaction finally reduce its terms to an executed writing, all negotiations and previous understandings are merged into the writings and the terms of the writing will control." *Oliver v. City Builders, Inc.,* 303 So. 2d 466, 469 (Miss. 1974) (citations omitted).

¶27.    Rosson was the sole shareholder and the sole employee of Julie Rosson Builder, Inc., and Acadian Bay Development, Inc.  This Court, citing a Georgia Appeals Court decision, has stated that, "[s]ole ownership of a corporation by one person or another corporation *is not a factor,* and neither is the fact that the sole owner uses and controls it to promote his ends." *Id.* (citing *Amason v. Whitehead,* 186 Ga. App. 320, 367 S.E.2d 107, 108 (1988) (citations omitted)). This Court also has held, "Just as the corporation's negligent performance of contractual duties does not justify the disregard of the corporate entity, neither does the fact that the principal shareholder oversees the day-to-day operation." *Id.*

> The attempt to hold another party liable where the claim asserted is of contractual origins presents difficulties. The question which must be met and answered is why one who contracted with a selected party and received the promise he bargained for should be allowed to look to another merely because he is disappointed in the selected party's performance. The answer under contract law is that he may not hold the other liable without additional compelling facts.

*Gray,* 541 So. 2d at 1047.

11

¶28. It is clear that McFarland did not contract with Rosson individually for performance or require Rosson to guarantee the performance of Acadian Bay. Thus, McFarland fails to satisfy the first prong required by *Gray* to pierce the corporate veil.

**B) The flagrant disregard for corporate formalities by the defendant corporation and its principals.**

¶29. Rosson testified that she operated three corporations during the period in which McFarland's home was being built. These companies operated from the same street address and used the same phone number. Her reasoning for using three companies was to keep lots and development separate from building as it was "confusing to my accountant and myself [to have one company]. Just it was easier to keep them–they were separate, doing separate things. So it was just easier to keep them separate."

¶30. On Rosson's 1998 tax return (the year of completion of McFarland's home), Rosson filed individually and listed Acadian Bay; Good Earth; and Seaside Interiors, Inc., on the return.[3]

¶31. Rosson introduced into evidence twenty-four (24) invoices from the suppliers used to construct McFarland's home. Of these twenty-four invoices, four invoices list the items being sold to Julie Rosson, individually. The remaining twenty invoices list items sold to either Acadian Bay; Good Earth; Julie Rosson Builder, Inc.; or Seaside Interiors. On the invoices which required a signature, Rosson signed these invoices, "Acadian Bay Development, Julie Rosson, Pres."

---

[3]Although listed on an invoice, Seaside Interiors was never a party to this lawsuit.

12

¶32.    Under Miss. Code Ann. Sect. 73-59-3, a builder must have a license issued by the State Board of Contractors. Rosson applied for a license in 1994. This application and its renewal forms (until 1998) were admitted as Plaintiff's Exhibit 19. In her 1994 application, she applied for the license in the name of "Julie Rosson." However, when asked what type of business entity the license was for, she stated "corporation." The date of incorporation and the officers of the corporation were listed as well. In the section entitled, "Name of person authorized in by-laws or minutes to bind the corporation by signature," it was signed "Julie Rosson, President." Each of the renewal forms for the building license is identical to the 1994 application, with the exception of the 1995 renewal form, in which the only difference is that Rosson states the license should be issued in the name of Julie Rosson Builder, Inc.

¶33.    In *Thames,* 373 So. 2d at 1035, this Court found that a construction corporation did not adhere to the corporate formalities and that the corporation was no more than the alter ego of the defendant.  Facts in this case which distinguish *Thames* are that Rosson knew the officers of the corporation; and the corporation had a separate checking account, as well as separate tax returns.  Acadian Bay was licensed by the Secretary of State to do business in Mississippi.

¶34.    When asked if the corporation maintained books and filed tax returns, Rosson testified that her books were in the hands of her former attorney. Rosson produced tax returns for 1998 and 2002. She testified that the 1997 and 2000 tax returns were in the possession of her CPA.  No evidence was presented that Rosson's books or tax returns did not exist. As in *Richardson v. Jenkins Builders, Inc.,* 737 So. 2d 1030 (Miss. Ct. App. 1999), the evidence

13

presented that Rosson did not adhere to corporate formalities was "at best, extremely weak. . . ." *Id.* at 1032.

¶35.    While some of the elements of ***Thames*** are present, there are also substantial differences. *See **T.C.L.,*** 431 So. 2d at 922. The evidence is insufficient to establish a disregard for corporate formalities as in ***Gray. See Gray,*** 541 So. 2d at 1047.

>    **C)    Some indication of fraud or equivalent misfeasance by the corporate principals.**

¶36.    McFarland stated that Rosson fraudulently misrepresented herself to him, as well as to Southern Living, about her experience and ability to construct a home. However, the issue before us on appeal is whether Rosson, individually, is liable for the failed conduct of Acadian Bay. "Generally, a stockholder is not liable for the acts of the corporation. . .," ***T.C.L.,*** 431 So. 2d at 922 (citation omitted).

¶37.    Julie Rosson Builder, Inc., was listed in Southern Living magazine as a Custom Home Builder. Ada Love testified on behalf of Southern Living Magazine, that Rosson was highly recommended to Southern Living by another builder in the industry. Love also testified that, upon review of Rosson's application and after speaking with owners of other homes Rosson had built, as well as to the material suppliers for these homes, the Southern Living Custom Home Builder program was satisfied to list Julie Rosson Builder, Inc., in its advertisement. Love also stated that she did not check with the Mississippi Board of Contractors to determine if any complaints had been filed against Julie Rosson. Love stated that was the responsibility of the homeowner. Love further testified she was not aware of Acadian Bay; however, she was aware that some of the builders in the Custom Home Program may operate

14

more than one company, and that the Southern Living advertisement does not suggest a preference for dealing strictly with Julie Rosson Builder, Inc., instead of Acadian Bay.

¶38.   Love further testified that it was expected that builders listed as Southern Living Custom Home Builders would comply with the rules in the Standard Building Code manual. However, Love admitted that this expectation never was actually discussed with Rosson. Expert witnesses in this matter, including those on behalf of Rosson, testified that McFarland's home did not comply with the Standard Building Code.

¶39.   Although McFarland's home did not comply with the Code, this does not mean Rosson fraudulently represented herself to Southern Living. Rosson's application was shown to be factually correct, and she was recommended to Southern Living by others in the building industry. Southern Living based its selection of Julie Rosson Builders, Inc., as a Custom Home Builder on these elements.

¶40.   McFarland further argues that Rosson fraudulently represented her experience and ability to him. During her testimony, Rosson stated she had no formal education in home building. She testified that since she was already a builder at the time the State of Mississippi began requiring building licenses of homebuilders, she was "grandfathered in" for licensing purposes and that she did not have to take an examination to obtain a license. Rosson further stated that since obtaining her license, she has not taken any classes on home building. However, Rosson said she gained experience in home building through experience and that she also relied on her subcontractors.

¶41.   While there  is no doubt that McFarland's home has substantial problems, it cannot be said these problems are answerable by Rosson individually. In his testimony, McFarland

15

stated that he did not rely on Rosson to guarantee the building contract personally. He contracted with Acadian Bay, and relied on this corporation and that of Julie Rosson Builder, Inc., to construct his home in the proper fashion with the appropriate products.

¶42.    In *Richardson,* the Court of Appeals held the fraud element required to pierce the corporate veil was not present where "Richardson presented no evidence that Jenkins, from the beginning, was intent on obtaining Richardson's money for his own personal use with no intention of performing on the contract and that he used a shell corporation to shield himself from personal liability on the day of reckoning that was inevitably to come." *Richardson,* 737 So. 2d at 1032. Similarly, here we find no evidence that Rosson used McFarland's money for her own personal benefit, or that Rosson was using a shell corporation as a shield from personal liability. "As [an] agent for a disclosed principal. . . they incur no individual liability, absent fraud or other equivalent conduct." *Gray,* 541 So. 2d at 1047.

> [The] principle commonly referred to as piercing the corporate veil is applied, however, with great caution and not precipitately [sic] and will not be applied where those in control have deliberately adopted the corporate form in order to secure its advantages in the absence of any violence to legislative purpose by treating the corporate entity as a separate legal entity.

*T.C.L., Inc. v. Lacoste,* 431 So. 2d 918, 922 (Miss. 1983).

¶43.    As stated above, expert witnesses testified at trial that there were, in fact, problems in the construction of McFarland's home. However, McFarland contracted with Acadian Bay to construct his home properly, and did not demand any individual guarantees from Rosson, nor did she make any. *Turner v. Wilson,* 620 So. 2d 545, 548 (Miss. 1993), held, "Individual liability of corporate officers or directors may not be predicated merely on their connection

16

to the corporation but must have as their foundation individual wrongdoing." In this case, there is no proof that Rosson acted in any capacity other than as that of officer, agent, or employee of the corporation, nor that Rosson was using a shell corporation as a shield from personal liability pursuant to ***Richardson***. *See **Richardson,*** 737 So. 2d at 1032.

## CONCLUSION

¶44.    McFarland failed to meet the standards established in ***Gray*** for piercing the corporate veil. Accordingly, this Court finds the trial court erred in failing to grant a JNOV for Rosson individually. We reverse the trial court's judgment against Rosson, and we render judgment in favor of Rosson that McFarland take nothing and finally dismissing his second amended complaint and this action with prejudice. Consistent with this opinion, the cross-appeal is dismissed as moot.

¶45.    **ON DIRECT APPEAL: REVERSED AND RENDERED; ON CROSS-APPEAL: DISMISSED.**

        **SMITH, C.J., WALLER, P.J., EASLEY, CARLSON, DICKINSON AND LAMAR JJ., CONCUR.    GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.  DIAZ, P.J., NOT PARTICIPATING.**

17