# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00308-COA

**GECKO OUTDOOR PRODUCTS**                                    **APPELLANTS**
**CORPORATION, CHRISTOPHER N. GARDNER**
**AND MAINSTREAM FAB INC.**

**v.**

**CASABLANCA CONSTRUCTION INC.**                             **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/30/2017 |
| TRIAL JUDGE: | HON. ANTHONY ALAN MOZINGO |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | JEFFREY BRADEN ARNOLD |
| ATTORNEYS FOR APPELLEE: | CAREY R. VARNADO |
| | ROBIN E. BLACKLEDGE BLAIR |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 06/26/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LEE, C.J., FOR THE COURT:**

¶1.     This case involved a subcontract between a contractor, Casablanca Construction Inc.,

and a subcontractor, Panhandle Metal Fabrication Inc.  The contractor sued Gecko Outdoor

Products Corp. and Mainstream Fab Inc. as successors-in-interest to Panhandle as well as

Christopher Gardner, individually.  Gardner was the owner and/or operator of all three

companies.  The trial court determined that the company remained the same regardless of the

name changes;[1] thus, the most recent iteration of the company (Mainstream Fab) was liable

---

[1] The names and dates of incorporation of the different companies include Panhandle (May 4, 2006); Mainstream Fabrication Inc. (June 8, 2012); Gecko Outdoor Products Corp.

to Casablanca, as a successor corporation, for breach of contract. Additionally, the trial court pierced the corporate veil and found Gardner individually liable. The trial court awarded Casablanca $393,954.58 in damages.

**FACTS AND PROCEDURAL HISTORY**

¶2. In 2012, Casablanca was hired as the general contractor on the Rodenberg Avenue Beach Comfort Station Project in Biloxi, Mississippi. The anticipated completion date was August 2013. On April 27, 2012, Casablanca entered into a subcontract with Panhandle.[2] The contract was signed by Tabby Waters as president of Panhandle and witnessed by Gardner. According to the terms of the subcontract, Casablanca would pay Panhandle $122,144.12 for the fabrication and installation of metal handrails. The subcontract included a time-is-of-the-essence requirement and a liquidated-damages clause stating that Panhandle would have to reimburse Casablanca for any damages assessed by the project-owner in the event of delays or difficulties caused by Panhandle.

¶3. Tom Saucier, president of Casablanca, testified that he received an email from Gardner that Panhandle's name had been changed to Mainstream Fabrication Inc. (MFI),[3]

---

(May 1, 2013); and Mainstream Fab Inc. (May 27, 2014). Casablanca did not sue Mainstream Fabrication Inc.

[2] Panhandle was a Florida corporation, initially owned by Gardner and his wife, Tabby Waters. Gardner later transferred ownership to Waters for better chances at obtaining government contracts. Gardner remained vice president and registered agent until Panhandle was voluntarily dissolved on March 8, 2013. Gardner admittedly dissolved Panhandle to avoid a judgment in Louisiana.

[3] MFI was incorporated in Florida. Waters was listed as president and Gardner as vice president.

2

but that all other aspects remained the same.[4]  In October 2012, Gardner sent shop drawings of the handrails to Saucier.  The name on the renderings said, "MFI, Mainstream Fabrication Inc."  The address listed, 4007 North Pace Blvd., was the same address as Panhandle.

¶4.    In April 2013, Saucier, the project owner, and the project's architect met with Gardner to discuss the delay in manufacturing the handrails.  A letter from the architect to Saucier stated that the "meeting was arranged by Casablanca as a last resort effort in maintaining their contract with [MFI]."  Shortly thereafter, Saucier sent an email to Waters at MFI inquiring as to the progress on the handrails.  Waters responded that MFI was having financial difficulty and requested Casablanca pay for the materials.  Waters further stated that Gardner "will be the one to coordinate with."

¶5.    The record contains copies of emails—dated May 2, 2013 and June 3, 2013—sent between Gardner and Saucier regarding the handrails.  Gardner signed these emails as vice president of MFI.  Saucier testified that he then had another meeting with Gardner, who informed him that Gecko would be manufacturing and installing the handrails.  Gardner told Saucier to make the checks payable to Gecko.  During the summer of 2013, Saucier testified that Casablanca paid Gecko approximately $74,500[5] to manufacture the handrails.

¶6.    Ultimately, Gecko failed to produce satisfactory handrails.  Casablanca had to pay another company to manufacture and install the handrails. Due to the delays, Casablanca had to pay liquidated damages of $197,865.

---

[4] This email was not produced at trial.

[5] The checks admitted into evidence totaled $90,000.

¶7. Casablanca filed a breach-of-contract action against Gecko as a successor-in-interest to Panhandle. Casablanca later amended its complaint, adding Gardner and Mainstream Fab[6] as defendants.

¶8. After a bench trial, the trial court ruled in favor of Casablanca, awarding it $393,954.58 in damages. The trial court noted that the judgment was against Mainstream Fab as well as Gardner, individually.

¶9. Gardner, Gecko, and Mainstream Fab now appeal, asserting the following issues: (1) Waters and MFI were necessary parties to the action; (2) Mainstream Fab was not the successor corporation to Panhandle; (3) the trial court erred in piercing the corporate veil and finding Gardner personally liable; and (4) the agreement between Gecko and Casablanca was invalid under the statute of frauds.

## STANDARD OF REVIEW

¶10. "In bench trials, a [trial court's] findings are subject to the same standard of review as those of a chancellor." *Transocean Enter. Inc. v. Ingalls Shipbuilding Inc.*, 33 So. 3d 459, 462 (¶7) (Miss. 2010) (quoting *Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 145 (¶11) (Miss. 2007)). "[W]hen a trial judge sits without a jury, this Court will not disturb his factual determinations where there is substantial evidence in the record to support those findings." *Id.* (quoting *Ezell v. Williams*, 724 So. 2d 396, 397 (¶4) (Miss. 1998)).

## DISCUSSION

---

[6] Gardner formed Mainstream Fab, purportedly to keep assets from Waters during their divorce proceedings. To be clear, Mainstream Fab is a separate entity from MFI. According to the Florida Secretary of State's website, Mainstream Fab was administratively dissolved on September 22, 2017.

## I. Necessary Parties

¶11. Gardner argues that the trial court erred in denying his motion to dismiss under Mississippi Rule of Civil Procedure 12(b)(7) for failure to join Waters as a party under Mississippi Rule of Civil Procedure 19(a).[7] Rule 19(a) provides that a person who is subject to the jurisdiction of the court shall be joined as a party in the action if:

> (1) in his absence complete relief cannot be accorded among those already parties, or

> (2) he claims an interest relating to the subject matter of the action and is so situated that the disposition in his absence may (i) . . . impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

¶12. Gardner claims that Waters had a direct and substantial interest in the action, mainly because she signed the contract with Casablanca on behalf of Panhandle. Gardner also claims that without Waters "valuable questions go unanswered." But, Gardner failed to specify what questions were unanswered, either during trial or in his brief.[8] Casablanca argues that the cause of action giving rise to the lawsuit did not occur until after Waters's involvement with the project ceased. The record is unclear as to when Waters's involvement with the project ceased—presumably when Gecko was formed because Waters was never associated with Gecko. We agree with Casablanca that by the time of the breach, Waters was not involved; thus, it was not error for the trial court to deny Gardner's motion to dismiss for

---

[7] Our standard of review regarding Rule 12(b) motions to dismiss is de novo. *Scaggs v. GPCH-GP Inc.*, 931 So. 2d 1274, 1275 (¶6) (Miss. 2006).

[8] Waters was not called as a witness during trial.

failure to join Waters.

## II.    Successor Corporation

¶13.    Gardner argues that Mainstream Fab was not a successor to Panhandle; thus, the trial court erred in holding Mainstream Fab liable. "The general rule states that a corporation which acquires the assets, but not the stock of another corporation, is not obligated for the liabilities of the acquired corporation." *Paradise Corp. v. Amerihost Dev. Inc.*, 848 So. 2d 177, 179 (¶6) (Miss. 2003). The four exceptions are "where: (1) the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) the transaction may be considered a de facto merger; (3) the successor may be considered a 'mere continuation' of the predecessor; or (4) the transaction was fraudulent." *Id.* Gardner argues that none of these exceptions apply. The trial court determined that Mainstream Fab and Gecko were mere continuations of Panhandle and MFI.

¶14.    "The traditional rule states that a corporation is not to be considered a continuation of a predecessor unless, after the transfer of assets, only one corporation remains, and there is an identity of stock, shareholders, and directors between the two corporations." *Id.* at 180 (¶12). Mere continuation can also occur when a continuity of enterprise exists. In addition to the traditional rule, the continuity-of-enterprise factors include:

> (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same physical location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise.

*Id.* at (¶14).

6

¶15. The record contains evidence of several of these factors. Casablanca was informed that Panhandle's name had changed but all other aspects of the business relationship remained the same. Subsequently, Casablanca, the project owner, and the project architect expected MFI as Panhandle's successor to perform its obligations under the subcontract. When MFI began having financial difficulty, Saucier stated that he was informed Gecko would then be manufacturing and installing the same product. Throughout this process, Gardner remained the point person on the project.

¶16. Gardner argues that Gecko and Mainstream Fab were created after Panhandle had already dissolved and the shareholders and directors of the companies were not the same. However, Gardner formed MFI prior to Panhandle's dissolution, and MFI held itself out as the continuation of Panhandle. Likewise, Gecko then held itself out as the continuation of MFI. Gardner admittedly created MFI in order to avoid Panhandle's legal obligations on another project, and he created Mainstream Fab to protect his assets during his divorce from Waters. Because of Gardner's actions, the trial court noted that the fraudulent-transaction exception also applied.

¶17. Upon review of the record, we find substantial evidence to support the trial court's decision. This issue is without merit.

### III. Corporate Veil

¶18. Gardner argues that the trial court erred in piercing the corporate veil and finding him individually liable. Under *Gray v. Edgewater Landing Inc.*, 541 So. 2d 1044, 1047 (Miss. 1989), for a court to disregard the corporate entity and justify shareholder liability, the

7

complaining party must show credible evidence of the following: "(a) some frustration of contractual expectations regarding the party to whom he looked for performance; (b) the flagrant disregard of corporate formalities by the defendant corporation and its principals; [and] (c) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder." Our case law disfavors piercing the corporate veil except in clearly extraordinary situations, and the "distinct corporate identity will be maintained unless to do so would subvert the ends of justice." *Johnson & Higgins v. Comm'r of Ins. of Miss.*, 321 So. 2d 281, 284 (Miss. 1975). We "recognize that the corporate veil will not be pierced, in either contract or tort claims, except where there is some abuse of the corporate form itself." *Penn Nat'l Gaming Inc. v. Ratliff*, 954 So. 2d 427, 432 (¶10) (Miss. 2007).

¶19.     The first prong addresses who Casablanca expected to be responsible for the contract. According to Saucier's affidavit, he looked to Gardner "individually to perform the terms of the contract." Saucier further stated that when the name of Panhandle changed to MFI and then to Gecko, "Gardner became an even more prominent figure in the project. He was the constant person upon whom I relied for performing the terms of the contract . . . . He was on site performing the work and continued to be the only person with whom I dealt." Saucier stated that he did not know of Gecko's existence until Gardner asked Saucier to make the checks payable to Gecko. Gecko's name was not mentioned until payment was due. *Gray* states that "[j]ust as the corporation's negligent performance of contractual duties does not justify the disregard of the corporate entity, neither does the fact that the principal shareholder oversees the day-to-day operation." *Gray*, 541 So. 2d at 1047. However, in this

8

instance, we find credible evidence exists to support this prong.

¶20.    The second prong addresses whether Gardner flagrantly disregarded the corporate formalities.  During discovery, Casablanca requested copies of Gardner's corporate records, including the articles of incorporation; notices of all shareholder meetings; minutes of shareholder meetings; notices of all director's meetings; minutes of all director's meetings; all documents signed by directors in lieu of a formal notice of a director's meeting; all documents signed by shareholders in lieu of a formal notice of shareholder meetings; bylaws and all amendments to bylaws and resolutions of the Board of Directors adopting the bylaws; correspondence between Gardner and any officers or directors of the corporation pertaining to the corporate business; documents pertaining to the capitalization of the corporation; a stock transfer ledger; and the corporate record book.  Other than the articles of incorporation for Gecko and Mainstream Fab and the 2014 federal tax return for Gecko, Gardner failed to produce any of the documents requested.  Gardner's response was simply that he did not have these documents.  We find credible evidence to support this prong.

¶21.    The final prong addresses fraud or other misfeasance by Gardner.  This Court has held that the fraud element required to pierce the corporate veil was not present where plaintiff "presented no evidence that [the defendant], from the beginning, was intent on obtaining [the plaintiff's] money for his own personal use with no intention of performing on the contract and that he used a shell corporation to shield himself from personal liability on the day of reckoning that was inevitably to come." *Richardson v. Jenkins Builders Inc.*, 737 So. 2d 1030, 1032 (¶10) (Miss. Ct. App. 1999).  We note that non-performance of a contractual

9

obligation does not justify disregarding the corporate entity. *Gray*, 541 So. 2d at 1047. Casablanca produced evidence that Gardner admittedly knew he could not complete performance under the contract. During trial, Gardner admitted that he did not have a Mississippi contractor's license, a fact that he knew would prohibit him from installing the railings. After receiving the payments from Casablanca, Gardner paid himself and his employees, but failed to deliver the product. Once Saucier realized Gardner had no intent to perform under the contract, he hired another metal fabricator to manufacture and install the railings. Although piercing the corporate veil is disfavored except in clearly extraordinary situations, in this instance, we find substantial evidence to support the trial court's findings.

### IV. Statute of Frauds

¶22. Gardner claims the agreement between Gecko and Casablanca was not enforceable based upon the statute of frauds. *See* Mississippi Code Annotated section 75-2-201 (Rev. 2016). Gardner's argument is based on the premise that Mainstream Fab and Gecko were not successor corporations. However, we have found Gardner's arguments regarding that issue to be without merit. Gardner was performing under the original contract, a fact that he explicitly discussed with Saucier. Thus, we do not find this case falls under the statute of frauds.

¶23. **AFFIRMED.**

**IRVING, P.J., BARNES, CARLTON, FAIR AND WESTBROOKS, JJ., CONCUR. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. TINDELL, J.,**

**CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY GRIFFIS, P.J., AND GREENLEE, J.**

**TINDELL, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶24.    Because I find the trial court erred by piercing the corporate veil and holding Gardner individually liable, I concur in part and dissent in part from the majority's opinion.

¶25.    "Mississippi has a strong public policy favoring maintaining corporate entities and avoiding attempts to pierce the corporate veil . . . ." *Rest. of Hattiesburg LLC v. Hotel & Rest. Supply Inc.*, 84 So. 3d 32, 39 (¶23) (Miss. Ct. App. 2012) (internal quotation mark omitted).  As early as 1933, the Mississippi Supreme Court stated that "[a] corporation is an entity separate and distinct from its stockholders." *Ill. Cent. R.R. v. Miss. Cotton Seed Prods. Co.*, 166 Miss. 579, 579, 148 So. 371, 372 (1933).  Our courts have repeatedly recognized that piercing the corporate veil should be reserved "for factual circumstances which are clearly extraordinary—where to do otherwise would 'subvert the ends of justice.'" *Gray v. Edgewater Landing Inc.*, 541 So. 2d 1044, 1046 (Miss. 1989) (quoting *Johnson & Higgins of Miss. Inc. v. Comm'r of Ins.*, 321 So. 2d 281, 284 (Miss. 1975)).  Because it is my opinion that the extraordinary factual circumstances required to pierce the corporate veil do not exist in this case, I must respectfully dissent from the portion of the majority's opinion affirming the trial court's finding that Gardner was individually liable for breach of contract.[9]

---

[9] In its final judgment, the trial court found that "Gardner should be held personally liable for breach of the said [c]ontract pursuant to judicial precedent [that] allows the [c]ourt to disregard attempts to shield an individual from individual liability by using a corporate form."  Although circumstances arise where the courts can and should pierce the corporate veil, standing alone, the trial court's reasoning presents an incorrect statement of Mississippi caselaw.  The primary purpose of the corporate form, particularly for small businesses, is to protect the shareholders/owners from individual liability.  *See Gray*, 541 So. 2d at 1047.

11

¶26. Gardner incorporated Panhandle in Florida on May 4, 2006. In 2012, Panhandle submitted a bid to Casablanca for the fabrication of metal handrails for a project by the Coast Transit Authority in Biloxi, Mississippi.[10] On April 27, 2012, Panhandle entered into a subcontract agreement with Casablanca, whereby Panhandle was to "furnish all material and labor for all aluminum handrail and related work[.]" In exchange for those services, Casablanca agreed to pay Panhandle $122,144.12. Saucier, Casablanca's president, executed the agreement on Casablanca's behalf, and Waters, Panhandle's president/director, executed the agreement on Panhandle's behalf.[11]

¶27. In June 2012, Waters incorporated MFI in Florida and became MFI's president.[12] In October 2012, Casablanca received shop drawings of the handrails with MFI's name and logo on the drawings. Over the next several months, MFI sent Casablanca multiple sets of handrails that the project architect, the firm of Eley Guild Hardy (EGH), repeatedly rejected.

¶28. EGH's records indicated that Casablanca arranged an April 4, 2013 site meeting with MFI "as a last[-]resort effort" to maintain the contract with MFI. Concerned with the progress of satisfactory handrails, Saucier then emailed Waters about their status on April

---

Furthermore, I find Casablanca failed to present the necessary credible evidence to meet every prong of the test for piercing the corporate veil.

[10] Casablanca had been awarded the contract with the Coast Transit Authority for the construction of Comfort Station on the beach in Biloxi.

[11] Waters was Gardner's wife and was Panhandle's sole shareholder at the time she executed the contract.

[12] According to Gardner, Waters alone made the decision to cease operating as Panhandle and to start operating as MFI. Gardner testified he did not support the decision. On March 18, 2013, Waters dissolved Panhandle.

23, 2013. Waters responded the following day from an MFI email account and advised Saucier to coordinate with Gardner when the project was acceptable to field measure. Waters also advised Saucier that MFI was having financial troubles and that Casablanca would have to pay for any further materials needed to fabricate the handrails. On June 3, 2013, Gardner emailed Saucier and advised that his drafter would correspond with Saucier about "field dems" needed to complete the drawings. The email was digitally signed as follows: "Chris Gardner, Vice President, Mainstream Fabrication, Inc."

¶29. Needing the handrails completed, Saucier traveled to Florida to meet with Waters and Gardner. At the meeting, Waters explained to Saucier that she no longer wanted to do the contract because of the difficulties MFI was having in meeting EGH's expectations for the quality of the handrails. At some point during the meeting, Saucier spoke to Gardner alone and implored Gardner to complete the handrails. At that juncture, Gardner agreed to complete the handrails through Gecko, a new company he had formed.[13] When asked about Casablanca's approval for another contractor to complete the handrails, Saucier testified as follows: "I obviously gave consent whenever he [(Gardner)] told me he was going to [do] the contract under Gecko and asked me to pay Gecko for it."

¶30. From June 11, 2013, through August 9, 2013, Casablanca made out six checks to Gecko that totaled $75,400. Eventually, Gecko delivered the handrails, but once again, they failed to meet EGH's requirements. Frustrated, Saucier returned to Florida and met with Gardner a final time. Gardner explained to Saucier that his rollers had crushed the tubing

---

[13] With the financial problems facing MFI and his marriage to Waters suffering, Gardner had incorporated Gecko with the intent of fabricating tree stands for hunters.

13

and that he did not possess the necessary rollers to meet EGH's requirements. Casablanca then retained another fabricator to complete the handrails.

¶31. In both tort and contract claims, the corporate entity will not be disregarded unless the complaining party can demonstrate the following: "(1) some frustration of expectations regarding the party to whom he looked for performance; (2) the flagrant disregard of corporate formalities by the defendant corporation and its principals; and (3) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder." *Penn Nat'l Gaming Inc. v. Ratliff*, 954 So. 2d 427, 431 (¶9) (Miss. 2007) (citing *Gray*, 541 So. 2d at 1047)). The complaining party must establish each of these factors by credible evidence. *Rosson v. McFarland*, 962 So. 2d 1279, 1285 (¶23) (Miss. 2007). While I am not convinced a flagrant disregard for corporate formalities occurred in this case that rises to the level necessary to meet the second prong, I acknowledge that some corporate records appear to be lacking. Nevertheless, I find Casablanca presented no credible evidence as to the first and third factors needed to pierce the corporate veil.

¶32. As to the first prong, the contract, on its face, places the burden of performance on a corporation and not on an individual. *See Richardson v. Jenkins Builders Inc.*, 737 So. 2d 1030, 1032 (¶9) (Miss. Ct. App. 1999) (refusing to pierce the corporate veil where the parties' contract, on its face, placed the burden of performance on a corporation rather than on an individual). No arguable basis exists for concluding that Casablanca actually believed or was justified in believing that Gardner himself was individually guaranteeing the contract's performance. EGH's project records indicated that everyone looked to MFI, rather

14

than to Gardner individually, to guarantee performance. EGH's notes stated that Casablanca arranged an April 4, 2013 site meeting with MFI "as a last[-]resort effort" to maintain the contract with MFI. In addition, Saucier admitted that he later approved Gecko, and not Gardner individually, to complete the handrails and that, thereafter, Casablanca made payments to Gecko rather than to Gardner individually. The handrail drawings Casablanca received had MFI's corporate logo and name on them, and all written correspondence was sent on corporate letterhead that identified both Waters and Gardner as president and vice president, respectively. "Just as the corporation's negligent performance of contractual duties does not justify the disregard of the corporate entity, neither does the fact that the principal shareholder oversees the day-to-day operation." *Gray*, 541 So. 2d at 1047. The fact that Gardner served as a point of contact for Casablanca and oversaw the handrails' fabrication simply is not enough to satisfy the first prong.

¶33.    As to the third factor, no evidence establishes that Panhandle entered into the contract with Gardner intending either to convert Casablanca's funds for his own personal use or to never perform under the contract. To the contrary, Gardner and Saucier both agreed that Gecko would complete the handrails at a time when Gecko was under no obligation to provide the handrails. As the majority recognizes, Gardner admitted he knew he could not install the handrails in Mississippi because he was not a licensed Mississippi contractor. The majority points to Gardner's admission as evidence that he knew he could not complete performance of the contract. However, the majority fails to recognize that, although Gardner himself may not have been able to install the handrails, Panhandle could have easily

15

subcontracted the installation to a licensed Mississippi contractor. Furthermore, at the time Casablanca approved Gecko to complete the project, Casablanca only sought to have Gecko deliver the handrails rather than install them. Contrary to any assertion of fraud, the record clearly shows that Gecko, and even MFI, attempted on multiple occasions to complete delivery of the handrails. These actions therefore do not rise to the level of fraud or other equivalent conduct. *See Trim v. Trim*, 33 So. 3d 471, 478 (¶19) (Miss. 2010) (discussing the elements of an intentional or fraudulent representation).

¶34. For these reasons I concur in part and dissent in part from the majority's opinion.

**GRIFFIS, P.J., AND GREENLEE, J., JOIN THIS OPINION.**