TINDELL, J., CONCURRING IN PART AND DISSENTING IN PART:
¶ 24. Because I find the trial court erred by piercing the corporate veil and holding Gardner individually liable, I concur in *515 part and dissent in part from the majority's opinion.
¶ 25. "Mississippi has a strong public policy favoring maintaining corporate entities and avoiding attempts to pierce the corporate veil ...." Rest. of Hattiesburg LLC v. Hotel & Rest. Supply Inc. , 84 So.3d 32, 39 (¶ 23) (Miss. Ct. App. 2012) (internal quotation mark omitted). As early as 1933, the Mississippi Supreme Court stated that "[a] corporation is an entity separate and distinct from its stockholders." Ill. Cent. R.R. v. Miss. Cotton Seed Prods. Co. , 166 Miss. 579, 579, 148 So. 371, 372 (1933). Our courts have repeatedly recognized that piercing the corporate veil should be reserved "for factual circumstances which are clearly extraordinary-where to do otherwise would 'subvert the ends of justice.' " Gray v. Edgewater Landing Inc. , 541 So.2d 1044, 1046 (Miss. 1989) (quoting Johnson & Higgins of Miss. Inc. v. Comm'r of Ins. , 321 So.2d 281, 284 (Miss. 1975) ). Because it is my opinion that the extraordinary factual circumstances required to pierce the corporate veil do not exist in this case, I must respectfully dissent from the portion of the majority's opinion affirming the trial court's finding that Gardner was individually liable for breach of contract.[9]
¶ 26. Gardner incorporated Panhandle in Florida on May 4, 2006. In 2012, Panhandle submitted a bid to Casablanca for the fabrication of metal handrails for a project by the Coast Transit Authority in Biloxi, Mississippi.[10] On April 27, 2012, Panhandle entered into a subcontract agreement with Casablanca, whereby Panhandle was to "furnish all material and labor for all aluminum handrail and related work[.]" In exchange for those services, Casablanca agreed to pay Panhandle $122,144.12. Saucier, Casablanca's president, executed the agreement on Casablanca's behalf, and Waters, Panhandle's president/director, executed the agreement on Panhandle's behalf.[11]
¶ 27. In June 2012, Waters incorporated MFI in Florida and became MFI's president.[12] In October 2012, Casablanca received shop drawings of the handrails with MFI's name and logo on the drawings. Over the next several months, MFI sent Casablanca multiple sets of handrails that the project architect, the firm of Eley Guild Hardy (EGH), repeatedly rejected.
¶ 28. EGH's records indicated that Casablanca arranged an April 4, 2013 site meeting with MFI "as a last[-]resort effort" to maintain the contract with MFI. Concerned with the progress of satisfactory handrails, Saucier then emailed Waters *516 about their status on April 23, 2013. Waters responded the following day from an MFI email account and advised Saucier to coordinate with Gardner when the project was acceptable to field measure. Waters also advised Saucier that MFI was having financial troubles and that Casablanca would have to pay for any further materials needed to fabricate the handrails. On June 3, 2013, Gardner emailed Saucier and advised that his drafter would correspond with Saucier about "field dems" needed to complete the drawings. The email was digitally signed as follows: "Chris Gardner, Vice President, Mainstream Fabrication, Inc."
¶ 29. Needing the handrails completed, Saucier traveled to Florida to meet with Waters and Gardner. At the meeting, Waters explained to Saucier that she no longer wanted to do the contract because of the difficulties MFI was having in meeting EGH's expectations for the quality of the handrails. At some point during the meeting, Saucier spoke to Gardner alone and implored Gardner to complete the handrails. At that juncture, Gardner agreed to complete the handrails through Gecko, a new company he had formed.[13] When asked about Casablanca's approval for another contractor to complete the handrails, Saucier testified as follows: "I obviously gave consent whenever he [ (Gardner) ] told me he was going to [do] the contract under Gecko and asked me to pay Gecko for it."
¶ 30. From June 11, 2013, through August 9, 2013, Casablanca made out six checks to Gecko that totaled $75,400. Eventually, Gecko delivered the handrails, but once again, they failed to meet EGH's requirements. Frustrated, Saucier returned to Florida and met with Gardner a final time. Gardner explained to Saucier that his rollers had crushed the tubing and that he did not possess the necessary rollers to meet EGH's requirements. Casablanca then retained another fabricator to complete the handrails.
¶ 31. In both tort and contract claims, the corporate entity will not be disregarded unless the complaining party can demonstrate the following: "(1) some frustration of expectations regarding the party to whom he looked for performance; (2) the flagrant disregard of corporate formalities by the defendant corporation and its principals; and (3) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder." Penn Nat'l Gaming Inc. v. Ratliff , 954 So.2d 427, 431 (¶ 9) (Miss. 2007) (citing Gray , 541 So.2d at 1047 ) ). The complaining party must establish each of these factors by credible evidence. Rosson v. McFarland , 962 So.2d 1279, 1285 (¶ 23) (Miss. 2007). While I am not convinced a flagrant disregard for corporate formalities occurred in this case that rises to the level necessary to meet the second prong, I acknowledge that some corporate records appear to be lacking. Nevertheless, I find Casablanca presented no credible evidence as to the first and third factors needed to pierce the corporate veil.
¶ 32. As to the first prong, the contract, on its face, places the burden of performance on a corporation and not on an individual. See Richardson v. Jenkins Builders Inc. , 737 So.2d 1030, 1032 (¶ 9) (Miss. Ct. App. 1999) (refusing to pierce the corporate veil where the parties' contract, on its face, placed the burden of performance on a corporation rather than on an individual). No arguable basis exists for concluding that Casablanca actually believed or was justified in believing that Gardner *517 himself was individually guaranteeing the contract's performance. EGH's project records indicated that everyone looked to MFI, rather than to Gardner individually, to guarantee performance. EGH's notes stated that Casablanca arranged an April 4, 2013 site meeting with MFI "as a last[-]resort effort" to maintain the contract with MFI. In addition, Saucier admitted that he later approved Gecko, and not Gardner individually, to complete the handrails and that, thereafter, Casablanca made payments to Gecko rather than to Gardner individually. The handrail drawings Casablanca received had MFI's corporate logo and name on them, and all written correspondence was sent on corporate letterhead that identified both Waters and Gardner as president and vice president, respectively. "Just as the corporation's negligent performance of contractual duties does not justify the disregard of the corporate entity, neither does the fact that the principal shareholder oversees the day-to-day operation." Gray , 541 So.2d at 1047. The fact that Gardner served as a point of contact for Casablanca and oversaw the handrails' fabrication simply is not enough to satisfy the first prong.
¶ 33. As to the third factor, no evidence establishes that Panhandle entered into the contract with Gardner intending either to convert Casablanca's funds for his own personal use or to never perform under the contract. To the contrary, Gardner and Saucier both agreed that Gecko would complete the handrails at a time when Gecko was under no obligation to provide the handrails. As the majority recognizes, Gardner admitted he knew he could not install the handrails in Mississippi because he was not a licensed Mississippi contractor. The majority points to Gardner's admission as evidence that he knew he could not complete performance of the contract. However, the majority fails to recognize that, although Gardner himself may not have been able to install the handrails, Panhandle could have easily subcontracted the installation to a licensed Mississippi contractor. Furthermore, at the time Casablanca approved Gecko to complete the project, Casablanca only sought to have Gecko deliver the handrails rather than install them. Contrary to any assertion of fraud, the record clearly shows that Gecko, and even MFI, attempted on multiple occasions to complete delivery of the handrails. These actions therefore do not rise to the level of fraud or other equivalent conduct. See Trim v. Trim , 33 So.3d 471, 478 (¶ 19) (Miss. 2010) (discussing the elements of an intentional or fraudulent representation).
¶ 34. For these reasons I concur in part and dissent in part from the majority's opinion.
GRIFFIS, P.J., AND GREENLEE, J., JOIN THIS OPINION.

In its final judgment, the trial court found that "Gardner should be held personally liable for breach of the said [c]ontract pursuant to judicial precedent [that] allows the [c]ourt to disregard attempts to shield an individual from individual liability by using a corporate form." Although circumstances arise where the courts can and should pierce the corporate veil, standing alone, the trial court's reasoning presents an incorrect statement of Mississippi caselaw. The primary purpose of the corporate form, particularly for small businesses, is to protect the shareholders/owners from individual liability. See Gray , 541 So.2d at 1047. Furthermore, I find Casablanca failed to present the necessary credible evidence to meet every prong of the test for piercing the corporate veil.

Casablanca had been awarded the contract with the Coast Transit Authority for the construction of Comfort Station on the beach in Biloxi.

Waters was Gardner's wife and was Panhandle's sole shareholder at the time she executed the contract.

According to Gardner, Waters alone made the decision to cease operating as Panhandle and to start operating as MFI. Gardner testified he did not support the decision. On March 18, 2013, Waters dissolved Panhandle.

With the financial problems facing MFI and his marriage to Waters suffering, Gardner had incorporated Gecko with the intent of fabricating tree stands for hunters.